**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**ROBERT DAVID STEELE, *et al.*,**

   **Plaintiffs,**

**v.**              **Civil Action No. 3:17cv601**

**JASON GOODMAN, *et al.*,**

   **Defendants.**

## <u>MEMORANDUM OPINION</u>

   This matter comes before the Court on five motions: (1) Defendant Patricia A. Negron's Motion to Dismiss for Failure to State a Claim ("Negron's Motion to Dismiss"),[1] (ECF No. 47); (2) Defendant Jason Goodman's "Special Motion to Dismiss the Complaint Under the VA Anti-Slapp Statute" ("Goodman's Motion to Dismiss"),[2] (ECF No. 45); (3) Goodman's Motion to Sever,[3] (ECF No. 46); (4) Goodman's Motion for Leave to Substitute Corrected Ghost Writing Form (the "Ghost Writing Motion"),[4] (ECF No. 71); and, (5) non-party D. George Sweigert's

---

[1] Plaintiffs Earth Intelligence Network ("EIN") and Robert D. Steele (collectively with EIN, "Plaintiffs") responded in opposition to Negron's Motion to Dismiss, (ECF No. 53), and Negron replied, (ECF No. 57).

[2] Plaintiffs responded in opposition to Goodman's Motion to Dismiss, (ECF No. 49), and Goodman replied, (ECF No. 52).

[3] Plaintiffs also responded in opposition to the Motion to Sever, (ECF No. 50). Goodman did not file a reply, and the time to do so has expired.

[4] No party opposed the Ghost Writing Motion.

Motion to Intervene (the "Motion to Intervene"),[5] (ECF No. 73).[6]  The Court also considers various non-party filings before it.

The matters are ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[7]  For the reasons that follow, the Court will deny in part and grant in part Negron's Motion to Dismiss; deny Goodman's Motion to Dismiss; deny the Motion to Sever; grant the Ghost Writing Motion; and take the Motion to Intervene under advisement.  Additionally, the Court will strike several non-party filings from the record.

## I.  Procedural and Factual Background

### A.    Procedural Background

On September 1, 2017, Plaintiffs filed their original Complaint (the "Original Complaint") against Jason Goodman, Patricia A. Negron, and "Queen Tut, a woman believed to be known as Carla A. Howell."  (Original Compl. 1, ECF No. 1.)  Goodman, proceeding *pro se*,

---

[5] Goodman opposed the Motion to Intervene, (ECF No. 78), but neither Plaintiffs nor Negron filed a response.  In the interest of judicial efficiency, the Court will order the parties to brief their position on the Motion to Intervene.

[6] The third and final named defendant, Susan A. Lutzke, has not made an appearance or responded to the Amended Complaint.  On September 3, 2018, Plaintiffs requested entry of default as to Lutzke.  (ECF No. 65.)  On September 6, 2018, the Clerk entered default as to Lutzke.  (ECF No. 66.)

[7] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  Steele is a Virginia citizen and EIN is a Virginia not-for-profit 501(c)(3) corporation.  (Am. Compl. 6, 9, ECF No. 39.)  Goodman is a New York citizen; Negron is a Massachusetts citizen; and Lutzke is a Colorado citizen.  (*Id.* 10, 12, 16.)

2

filed an Answer (the "Original Answer"),[8] (ECF No. 14), and Negron, by counsel, filed a Motion to Dismiss (the "Original Motion to Dismiss"), (ECF No. 21). Steele opposed the Original Motion to Dismiss, (ECF No. 24), and Negron replied, (ECF No. 29).

On January 23, 2018, Plaintiffs requested entry of default as to "Queen Tut a/k/a Susan A. Lutzke." (ECF No. 30.) Because the Original Complaint did not name as a defendant "Susan A. Lutzke," the Court denied Plaintiffs' request for entry of default. (*See* Mar. 9, 2018 Order, ECF No. 35.) On March 25, 2018, Plaintiffs moved to amend their Original Complaint, (ECF No. 36), and on April 11, 2018, the Court granted the motion, (ECF No. 38).

On April 13, 2018, Plaintiffs filed the Amended Complaint. (ECF No. 39.) The Amended Complaint names three defendants: Jason Goodman, Patricia A. Negron, and "Susan A. Lutzke a/k/a/ 'Queen Tut'" (collectively, "Defendants"). (Am. Compl. 1, ECF No. 39.) Plaintiffs state eight counts against each defendant as follows:

> **Count I:** Defamation *per se* (the defamation claim);
>
> **Count II:** Insulting words, in violation of Virginia Code § 8.01-45[9] (the insulting words claim);

---

[8] Goodman did not include a Ghost Writing Form as required under Rule 83.1(M) of the Local Rules for the United States District Court for the Eastern District of Virginia. On January 31, 2019, the Court ordered Goodman to submit the appropriate Ghost Writing Forms for each filing. (ECF No. 69.) On February 8, 2019, Goodman timely submitted the Ghost Writing Forms.

On February 13, 2019, Goodman filed the Ghost Writing Motion, which seeks to supplant one of the February 8, 2019 Ghost Writing Forms with an updated Ghost Writing Form. The proffered Ghost Writing Form states that an attorney "prepared or assisted [Goodman] in preparation of" the Original Answer. (Ghost Writing Mot. 5, ECF No. 71.) No party opposed the Ghost Writing Motion.

Given the lack of opposition, the Court will grant the Ghost Writing Motion and deem the February 13, 2019 Ghost Writing Form filed. Because the Amended Complaint and subsequent filings rendered moot the Original Answer, the Court need not address the effect of Goodman receiving legal assistance in filing the Original Answer.

[9] "All words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." VA. CODE ANN. § 8.01-45.

**Count III:** Business conspiracy, in violation of Virginia Code § 18.2-499[10] and Virginia Code § 18.2-500[11] (the statutory conspiracy claim);

**Count IV:** Common law conspiracy;

**Count V:** Tortious interference;

**Count VI:** Intentional Infliction of Emotional Distress;

**Count VII:** Personal trespass by computer in violation of Virginia Code § 18.2-152.7[12] and computer harassment in violation of Virginia Code § 18.2-152.7:1[13] (the computer claim);

---

[10] This section provides, in relevant part:

Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever . . . shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

VA. CODE ANN. § 18.2-499(A).

[11] This section provides, in relevant part:

Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, "damages" shall include loss of profits.

VA. CODE ANN. § 18.2-500(A).

[12] "A person is guilty of the crime of personal trespass by computer when he uses a computer or computer network to cause physical injury to an individual." VA. CODE ANN. § 18.2-152.7(A).

[13] This section provides:

If any person, with the intent to coerce, intimidate, or harass any person, shall use a computer or computer network to communicate obscene, vulgar, profane, lewd, lascivious, or indecent language, or make any suggestion or proposal of an obscene nature, or threaten any illegal or immoral act, he shall be guilty of a Class 1 misdemeanor.

VA. CODE ANN. § 18.2-152.7:1.

**Count VIII:**  Unauthorized use of name and picture in violation of Virginia Code § 8.01-40[14] (the unauthorized use claim); and,

**Count IX:**  Permanent injunction.

Plaintiffs seek $6,000,000 in compensatory damages; $18,000,000 as "[t]hree-fold [d]amages in accordance with § 18.2-500" of the Virginia Code; $350,000 in punitive damages; prejudgment and postjudgment interest; and attorney's fees and costs.  (Am. Compl. 96.)

In response to the Amended Complaint, Goodman filed Goodman's Motion to Dismiss and the Motion to Sever.  On the same day, Goodman filed an Answer.[15]  (ECF No. 44.)  Negron filed Negron's Motion to Dismiss.  Lutzke did not respond to the Amended Complaint and has not made an appearance of any kind.[16]  Plaintiffs responded in opposition to Goodman's Motion to Dismiss and Goodman replied.  Plaintiffs also responded in opposition to the Motion to Sever.

---

[14] This section provides, in relevant part:

> Any person whose name, portrait, or picture is used without having first obtained the written consent of such person . . . for advertising purposes or for the purposes of trade, such persons may maintain a suit in equity against the person, firm, or corporation so using such person's name, portrait, or picture to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use.

VA. CODE ANN. § 8.01-40.

[15] Plaintiffs argue that the Court must disregard Goodman's Motion to Dismiss because Goodman filed the Answer first, waiving his ability to file a Rule 12(b)(6) motion.  Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").  Goodman filed the Answer and Motion to Dismiss on the same day.  Although Plaintiffs correctly note that the Answer preceded the Motion to Dismiss on the docket (as entry numbers 44 and 45, respectively), the Court considers these filed simultaneously.  Although a defendant need not file an Answer while a pretrial motion, such as a Rule 12(b)(6) motion to dismiss, pends, the Federal Rules of Civil Procedure do not prevent a defendant from filing an Answer pending resolution of the pretrial motion.  Even a cursory review of Goodman's Answer shows that no inconsistencies exist between Goodman's position in his filings.  Accordingly, the Court will consider Goodman's Motion to Dismiss.

[16] Plaintiffs returned the summons as to Lutzke as executed.  (ECF No. 62.)

Goodman did not file a reply, and the time to do so has expired. Finally, Plaintiffs responded in opposition to Negron's Motion to Dismiss and Negron replied.

On September 3, 2018, Plaintiffs requested entry of default as to Lutzke. (ECF No. 65.) On September 6, 2018, the Clerk entered default as to Lutzke. (ECF No. 66.)

Various non-parties have also submitted documents in this matter. George D. Sweigert, a non-party proceeding *pro se*,[17] has filed seven declarations.[18] (ECF Nos. 51, 54, 55, 56, 58, 59, 60.) Sweigert also filed two Notices of Change of Address, (ECF No. 63, 67), and a Notice of Related Litigation, (ECF No. 68). On February 19, 2019, Sweigert filed a "Notice of Motion to Intervene," (ECF No. 72), and then, on the same day, filed the Motion to Intervene,[19] (ECF No. 73). Goodman opposed the Motion to Intervene. Sweigert subsequently sent several letters to the Clerk's Office. (ECF Nos. 75, 77.) On March 18, 2019, Sweigert filed a "Notice of Intent to File an Amended Motion," (ECF No. 81), but he has not filed any amended motion to date. In the interest of judicial efficiency, the Court will order Sweigert to file an Amended Motion to Intervene, should he still wish to do so.[20] On March 29, 2019, Sweigert filed a document titled "Preliminary Notification to the Government of Canada." (ECF No. 84.)

---

[17] The Amended Complaint does not make any allegations about Sweigert, but it references him twice: first, one quotation by Plaintiffs incidentally refers to Sweigart as part of a longer quotation; and, second, a related footnote describes Sweigert's identity to the reader for added context.

[18] These declarations have no bearing on the current analysis.

[19] Sweigert, proceeding *pro se*, did not include a Ghost Writing Form as required under Local Rule 83.1(M). *See* E.D. Va. Loc. Civ. R. 83.1(M). The Court will direct the Clerk to provide Sweigert with the Ghost Writing Form and will order Sweigert to fill out the form.

[20] The Court will grant Sweigert leave to file an Amended Motion to Intervene by close of business Friday, April 12, 2019. If Sweigert files an Amended Motion to Intervene, all parties must respond to it by no later than close of business Tuesday, April 23, 2019.

Additionally, on March 15, 2019, non-party Jacqulyn Weaver[21] filed a Declaration.[22] (ECF No. 79.) On March 15, 2019, non-party Dean Fougere[23] filed a "General Affidavit."[24] (ECF No. 80.) On March 18, 2019, non-party Steve Outtrim[25] filed a "Statement in Response to" Goodman's Response opposing Sweigert's Motion to Intervene.[26] (ECF No. 82.) Finally, on March 29, 2019, non-party Kevin Marsden[27] filed a "Statement in Response to" Goodman's Response opposing Sweigert's Motion to Intervene.[28] (ECF No. 83.) The Court will strike the

---

Should Sweigert fail to timely file an Amended Motion to Intervene, the Court will consider only the current Motion to Intervene and will not accept an amended motion after the deadline. If Sweigert does not file an Amended Motion to Intervene by the April 12, 2019 deadline, then Plaintiffs, Negron, and Lutzke must respond to the Motion to Intervene, (ECF No. 73), presently before this Court by no later than close of business Tuesday, April 23, 2019.

[21] The Amended Complaint makes no reference to Jacquelyn Weaver. (*See* Am. Compl.)

[22] Weaver cites to no rule or legal authority for her filing. Weaver "has not sought to intervene under [Federal Rule of Civil Procedure] 24, nor has [s]he received permission to file as an amicus curiae." *Kimberlin v. Nat'l Bloggers Club*, 2014 WL 12680738, at *1, No. PWG-13-3059 (D. Md. Feb. 21, 2014). The Court will strike the filing from the record, and will not consider future filings from non-parties. *See id.*

[23] The Amended Complaint makes no reference to Dean Fougere. (*See* Am. Compl.)

[24] Fougere cites to no rule or legal authority for his filing. Similar to Weaver, Fougere does not seek to intervene in the case, nor has he sought permission from the Court to file this document. *See Kimberlin*, 2014 WL 12680738 at *1. The Court will strike the filing from the record, and will not consider future filings from non-parties. *See id.*

[25] The Amended Complaint makes no reference to Steven Outtrim. (*See* Am. Compl.)

[26] Like Weaver and Fougere, Outtrim does not seek intervention, nor did he seek permission from the Court to file his declaration. Outtrim appears to deny and dispute allegations that Goodman makes in other filings. The Court will strike the filing from the record, and will not consider future filings from non-parties. *See Kimberlin*, 2014 WL 12680738 at *1.

[27] The Amended Complaint makes no reference to Kevin Marsden. (*See* Am. Compl.)

[28] Like the other non-party filers, Marsden appears to deny and dispute allegations that Goodman makes in other filings. The Court will strike the filing from the record and will not consider future filings from non-parties. *See Kimberlin*, 2014 WL 12680738 at *1.

filings that Weaver, Fougere, Outtrim, and Marsden submitted.  *See Kimberlin*, 2014 WL 12680738 at *1.

### B.     Summary of Allegations in the Complaint[29]

This action arises out of a series of allegedly defamatory statements that Defendants made against Plaintiffs beginning on June 15, 2017.  (Am. Compl. 20.)  The Court first provides context about the relevant parties to the action, followed by a summary of Defendants' actions and statements.

### 1.     Plaintiffs:  Steele and the Earth Intelligence Network

Steele describes a long list of professional accomplishments, presenting himself as a former Central Intelligence Agency ("CIA") operations officer, a former civil servant, and the holder of various advanced degrees.  (Am. Compl. 6.)  Steele works to "redirect[] the craft of intelligence away from spies and secrecy enabling war and waste towards open sources and methods favorable to peace and prosperity."  (*Id.* 8.)  In support of this work, Steele formed and operated a company[30] that ultimately helped draft the "NATO Open Source Intelligence Handbook."[31]  (*Id.*)  Steele asserts, without elaboration, that "[f]or over twenty (20) years, [Steele] has dedicated himself to teaching individuals and organizations about the value of

---

[29] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in the Complaint as true, and draw all reasonable inferences in favor of Plaintiffs.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

[30] In 1993, Steele formed Open Source Solutions, Inc., which Steele describes as "a pioneering open source intelligence ("OSINT") firm.  OSINT is a term used to refer to data collected from publicly available sources to be used in an intelligence context."  (Am. Compl. 7.)

[31] This publication "discusses the fundamentals of OSINT support to both the all-source intelligence process, and to the unclassified intelligence requirements of operators, logisticians, and civilian organizations participating in joint and coalition operations."  (Am. Compl. 8.)

holistic analytics, true cost economics, and Open Source Everything Engineering." (*Id.* 7.)
Steele "was nominated for a Nobel Peace Prize" based on this work. (*Id.* 8.)

In 2006, Steele founded Earth Intelligence Network ("EIN"), a Virginia 501(c)(3) not-for-profit corporation, and Plaintiff in this action. (*Id.* 9.) "The original purpose and long-term focus of Earth Intelligence Network is to teach citizens the urgency of demanding holistic analytics, true cost economics, and Open Source Everything Engineering (OSEE) as the foundation for enlightened self-governance." (*Id.* 9.) In order to fulfill this purpose, EIN started the #UNRIG (sometimes UNRIG) project, "an educational campaign to communicate to all citizens the possibility of an ethical, legal, non-violent restoration of integrity to the United States Government." (*Id.*) Plaintiffs describe the #UNRIG campaign as

> a legitimate full-time effort to unrig the system, "to restore integrity and truth to governance, with the informed will and wisdom of We the People at its heart", and "to enjoy a transparent government by 2022, that operates with honesty, respecting our planet and the human spirit, so that we may create a healthy, prosperous America rooted in truth with peace as our shared condition[.]"

(*Id.* 87–88 (quotations in original without attribution).) In support of this mission, Plaintiffs "acquired and professionally wrapped an RV, and began a national tour of the [c]ountry in furtherance of the 'Summer of Peace' campaign."[32] (*Id.* 86.)

Public donations fund the #UNRIG campaign, and EIN "is fully transparent and accountable to its donors." (*Id.* 9.) Plaintiffs aver they "account[] for every penny spent in a budget that was posted online." (*Id.* 86 (providing a weblink).) Using the donations, Plaintiffs "actively promote[] the mission of #UNRIG and communicate[] with all donors." (*Id.*)

---

[32] The "Summer of Peace" campaign sought to "nurture a national conversation about #UNRIG." (Am. Compl. 10.)

## 2. **Defendants: Goodman, Negron, and Lutzke**

According to Plaintiffs, Goodman operates "various social media properties" under the name "Crowdsource The Truth" or "CSTT."[33] (Am. Compl. 11.) Plaintiffs quote Goodman, without attribution, describing CSTT as "an independent news organization dedicated to truth in media and integrity in government. Our process is driven by a unique, open source fact checking 'truth engine' that has been described as a combination of investigative journalism, social media[,] and reality television." (*Id.*) Goodman creates and uploads videos through the various CSTT media properties, which have thousands of followers.[34] "Goodman solicits donations, advertises products and derives revenue from" these videos. (*Id.*) Goodman often hosts guest speakers in these videos, including Negron and Lutzke.[35]

Plaintiffs aver that Negron "co-produced numerous videos uploaded to the CSTT YouTube channel." (*Id.* 12.) She "appeared and actively participated in virtually every video at

---

[33] The Amended Complaint appears to identify links to CSTT's YouTube channel, a Facebook page, a Twitter account, a Patreon.com account, and a GooglePlus account. (Am. Compl. 11.)

[34] The Amended Complaint states:

As of September 1, 2017, 14,526 people subscribed to Goodman's YouTube channel, 1,925 people followed Goodman on Facebook, and Goodman had 8,886 followers on Twitter. As of March 23, 2018, 53,447 people subscribed to Goodman's YouTube channel, 4,189 people followed Goodman on Facebook, and Goodman had 21,700 followers on Twitter.

(Am. Compl. 11.)

[35] Although Plaintiffs do not expressly state that Steele appeared as a guest on CSTT videos prior to this action, they do so indirectly. For example, Steele quotes Goodman as saying, "Robert David Steele came on our show and he was trying to raise two hundred and fifty thousand dollars for his UNRIG campaign. . . ." (Am. Compl. 64.) Elsewhere in the Amended Complaint, Plaintiffs quote an anonymous CSTT guest as accusing Steele of coming onto Goodman's show and subsequently deceiving viewers. (Am. Compl. 29.)

The Court provides this information only to add context, given that whether Steele previously appeared on CSTT has no bearing on the current analysis.

issue in this action, one of which was even filmed at her home." (*Id.*) Negron allegedly has over 24,000 followers on Twitter, where she allegedly republished defamatory statements made by Lutzke about Plaintiffs. (*Id.*)

According to Plaintiffs, Lutzke adopted the pseudonym "Queen Tut" as her online persona, using an image of an Egyptian bust[36] to represent herself.[37] (*Id.* 16.) Lutzke participated in numerous CSTT videos speaking as Queen Tut. In the videos, Defendants refer to Lutzke as Queen Tut and display a picture of the Egyptian statue to represent Lutzke.

### 3. Defendants' Actions Through September 1, 2017[38]

Steele planned on appearing in a CSTT live-stream broadcast on June 15, 2017, in which Goodman and Negron would interview Steele. (Am. Compl. 18.) The day before the scheduled interview, on June 14, 2017, Goodman and Negron published a video that reported, seemingly falsely, that a dirty bomb was present on a ship.[39] As a result of this event, and the ensuing FBI investigation, Steele "immediately canceled the planned interview" and informed Goodman via

---

[36] Plaintiffs note that the image that Lutzke uses "is actually that of Queen Nefertiti." (Am. Compl. 4 n.1.)

[37] Plaintiffs previously identified "Queent Tut" as "Susan Holmes." (*See* Original Compl., ECF No. 1.) Plaintiffs later amended their Original Complaint, naming "Susan Lutzke" as a defendant. Plaintiffs returned the Summons as to Lutzke as executed, (ECF No. 62), and nothing properly before the Court suggests that Plaintiffs misidentify Lutzke as a proper defendant in this action. Having failed to respond or make an appearance in this Court, the Clerk of Court entered default against Lutzke on September 6, 2018. (ECF No. 66.)

[38] Plaintiffs filed the Original Complaint on September 1, 2017. The Amended Complaint, filed on April 18, 2018, adds new factual allegations about Defendants' alleged actions after learning of this suit. The Court discusses allegations related to Defendants' post-filing actions below.

[39] In the video, Goodman and Negron claimed a ship at the Port of Charleston, South Carolina, possessed a "dirty bomb." (Am. Compl. 19.) Goodman and Negron encouraged viewers to alert the United States Coast Guard about the threat, which caused a terminal at the port to shut down. (*Id.*) The Federal Bureau of Investigation (the "FBI") opened an investigation into the "false report of a dirty bomb aboard the" vessel. (*Id.*)

email that Steele did not wish to associate with Goodman any longer.  (*Id.* 19.)  According to

Plaintiffs, "in retaliation and reprisal for [Steele's] decision to no longer have anything to do with

Goodman and CSTT, Goodman, Negron[,] and Lutzke began an unprecedented smear campaign

against Plaintiffs."  (*Id.* 20.)

      As part of this "smear campaign," Goodman, Negron, and Lutzke produced and

published at least a dozen videos between June 15, 2017 and September 1, 2017.  On June 16,

2017, Goodman and Negron produced and appeared in a video in which Goodman states he

"made a big mistake" with Steele.  (*Id.* 21 (quoting Goodman).)  In a second video produced and

published on the same day, in which both Goodman and Negron appear, Goodman makes

disparaging remarks about Steele.  Plaintiffs describe the video as "scripted ahead of time," after

Goodman and Negron "discussed the subject matter and content via email, telephone and/or text

message.  They agreed upon the thesis, theme and tone.  Goodman and Negron [spoke] with one

voice."  (*Id.* 22.)  In a June 20, 2017 video, Goodman and Negron appear together in a London

hotel room, and Goodman accuses Steele of stealing from the CSTT audience at least three

times.  (*Id.* 23.)

      On June 26, 2017, Lutzke appeared in a CSTT video as Queen Tut to accuse Steele of

fraud.  The June 26, 2017 video description provides that "Confidential Crowdsource contact

Queen Tut believes [Steele] has perpetrated a deliberate fraud and details her position in this

phone call."  (*Id.* 24 (purporting to quote Goodman).)  The Amended Complaint includes a

screenshot of the video, showing a stillshot of a man on the left (Goodman) and a photo of an

Egyptian bust meant to represent Lutzke.  In this video, Goodman states, "I question if he,[sic] if

any of his credentials are authentic.  I think he's just a cheap con man."  (*Id.* 25 (quoting the June

26, 2017 video).)  In the same video, Goodman states that Steele "knows it's a useless

campaign[;] he's just trying to suck $250,000 out of people." (*Id.* (quoting the June 26, 2017 video).) Lutzke agrees, stating, "He's really conning people and he's trying to manipulate me." (*Id.* (quoting the June 26, 2017 video).) Goodman accuses Steele of being "involved in a pretty serious financial scam" and of "defrauding people across state lines," stating that "a Rico[40][sic] charge could be involved" because "it seems like he is doing things that are very criminally actionable." (*Id.* (quoting the June 26, 2017 video).) Goodman describes Steele as displaying "schizophrenic behavior" and refers to him as "the robber David who [s]teals." (*Id.* (quoting the June 26, 2017 video).)

Between June 15, 2017 and September 1, 2017, Goodman, Negron, and Lutzke published dozens of similar videos. The Amended Complaint provides great detail, including links, screenshots, and direct quotations excerpted from these videos. Goodman appears in all of the videos and is the primary speaker. Plaintiffs allege that Negron co-produced most of the videos, also appearing in many of them, thereby contributing to the insults against Steele and #UNRIG. Lutzke makes a guest appearance on many videos, insulting Steele directly. Lutzke also published derogatory information about Steele on her Twitter account.

Defendants' exact invectives vary over the course of the videos, sometimes focusing on personal insults against Steele[41] and sometimes making accusations against Steele and his organizations, including Plaintiff EIN. Goodman calls Steele a "fraudster," and states that "[Steele]'s lying." (*Id.* 28, 45, 55 (quoting various videos).) He claims "that the objective of the

---

[40] This appears to be a reference to the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 18 U.S.C. §§ 1961, *et seq.*

[41] In one video, Goodman states that he "find[s] it really difficult to believe that he was ever in the CIA because he just seems so f---ing stupid." (Am. Compl. 36 (quoting an August 7, 2017 video).) Negron describes Steele as "predatory in nature." (*Id.* 40 (quoting an August 13, 2017 video).) Goodman refers to EIN as "Steele's highly unintelligent business organization." (*Id.* 56 (quoting a September 23, 2017 video).)

UNRIG campaign is to 'get money' for [Steele]." (*Id.* 41 (quoting an August 13, 2017 video).)

Lutzke calls EIN's #UNRIG campaign "a total scam" and states that "Robert David Steele and

UNRIG are trying to raise money, as much money as they possibly can to fund their little scam."

(*Id.* 40, 46 (quoting multiple videos).)  Negron calls Steele "a serious con man." (*Id.* 45 (quoting

an August 26, 2017 video).)  Negron further states:  "this is a serious fraud. I mean that it is a

fraud. No question." (*Id.* 46 (quoting an August 26, 2017 video).)  Defendants refer to "the

Electoral Reform Act"[42] and describe it as part of Plaintiffs' scam.  (*See, e.g.*, *id.* 45 (quoting an

August 26, 2017 video).)

In addition to these videos, the Amended Complaint describes several other online

platforms through which Defendants publish disparaging comments regarding Plaintiffs,

including Twitter and email.  On August 11, 2017, for example, Goodman emailed Dr. Cynthia

Ann McKinney,[43] stating that Steele "has repeatedly made ignorant and even racist comments,

has defrauded my audience of money, has personally and publicly insulted me and is actively

attempting to co-opt your credibility to raise funds." (*Id.* 38.)

---

[42] The allegations in the Amended Complaint do not directly reference or explain the "Electoral Reform Act," which the Amended Complaint also refers to as the "Election Reform Act."  Various excerpted video quotations provide some context, though the Court does not credit these as-yet unverified statements.  These statements suggest that Steele raised money to draft a bill for United States Senator Rand Paul, which would become the Election Reform Act. (Am. Compl. 35, 61.)  Defendants, in their videos, accuse Steele of misrepresenting these efforts, claiming that Steele used the money raised for the "Election Reform Act" for his own purposes. (*Id.*)

[43] The Amended Complaint describes McKinney as one of two "core team members" of EIN.  (Am. Compl. 10.)  Plaintiffs describe McKinney as a former United States Congresswoman from Georgia and an "internationally-recognized . . . humanitarian and anti-war activist." (*Id.*)

Although some inconsistencies exist,[44] the videos and publications, amply excerpted in the Amended Complaint, share a consistent theme. Defendants persistently accuse Plaintiffs of perpetuating a scam and a fraud on CSTT viewers who donated to EIN's #UNRIG campaign, accusing Plaintiffs of stealing donors' money to personally enrich Steele or his allies[45] rather than using the funds for the #UNRIG mission.

### 4.    Defendants' Actions After September 1, 2017

Plaintiffs allege that a shift occurred after the filing of this action. While Goodman and Lutzke intensified their attacks against Plaintiffs, Negron ceased to participate in any subsequent video productions or appearances (with one exception). Although Plaintiffs concede Negron ceased her conspiring activities regarding video production with Goodman, Plaintiffs maintain that Negron and Lutzke continued to conspire to defame Plaintiffs through Twitter publications. Negron also limited her role to republishing some of Lutzke's statements.

Between September 1, 2017 and December 2017,[46] Plaintiffs allege that Goodman and Lutzke produced and published about ten videos containing defamatory statements about Plaintiffs. Many of the videos reiterate the same kinds of statements made in previous videos. For example, in one video, Goodman states, "Steele is not in fact engaged in a campaign to execute election reform." (Am. Compl. 50 (quoting a September 6, 2017 video).) Lutzke also

---

[44] For instance, at one point, Goodman suggests Steele never worked for the CIA. (Am. Compl. 35–36.) Later, Goodman suggests Steele remains active in the CIA. (*Id.* 72 (quoting a February 23, 2018 video).)

[45] In one video, Lutzke states that Steele "is soliciting donations in [McKinney's] name to pay off her student loans, taxes, and to provide some type of compensation." (Am. Comp. 41 (quoting Lutzke in an August 13, 2017 video).)

[46] Around this date, according to Plaintiffs, Goodman and Lutzke had some kind of falling out and did not produce any more videos together. (Am. Compl. 67, 74–75, 83.) Plaintiffs allege that Goodman and Lutzke, acting individually, continued their defamatory actions. (*Id.* 70–73, 78.)

alleges that Steele did not engage in his "Summer of Peace" campaign, claiming "[t]hey never went anywhere. Basically, it never happened." (*Id.* 52 (quoting a September 11, 2017 video).)

Defendants also acknowledge and discuss the ongoing litigation in their videos. In a September 23, 2017 video, Goodman and Lutzke "accuse [Steele] of engaging in a 'conspiracy to suppress free speech.'" (*Id.* 55.) Lutzke states that "we were the ones who revealed his basic fraud that he's been perpetuating for a number of years using this electoral reform act." (*Id.* (quoting a September 23, 2017 video).) In the same video, Goodman suggests that Steele "is trying to raise money so he can buy RVs so he can crash them and buy soft drinks and give gifts." (*Id.* 56 (quoting a September 23, 2017 video).) Lutzke states, "Steele is in a conspiracy to take down Crowdsource the Truth." (*Id.* 57 (quoting a September 23, 2017 video).) In a different video featuring Goodman and Lutzke, Goodman states "we have very solid evidence of fraud." (*Id.* 60 (quoting a September 30, 2017 video).) Goodman describes himself as "happy" about the lawsuit "go[ing] forward" because the lawsuit will expose "charity fraud and tax fraud." (*Id.* 62 (quoting an October 7, 2017 video).)

Knowledge of the lawsuit does not appear to deter Goodman or Lutzke from attacking Plaintiffs.[47] Well after actual notice of the lawsuit, communicated in the September 23, 2017 video described above, Goodman and Lutzke published other videos disparaging Plaintiffs. In one video, Goodman and Lutzke refer to Steele's "fraudulent election reform campaign." (*Id.* 61 (quoting a September 30, 2017 video). Lutzke calls this "charity fraud . . . [T]hat's a fact." (*Id.*) Goodman warns viewers that they, as donors, may face legal consequences:

---

[47] As with videos predating the action, Goodman and Lutzke insult Steele personally. For example, Goodman refers to Steele as an "idiot, such a dummy, such a loser, and you know what, losers lose, that's what they do." (Am. Compl. 65–66 (quoting a March 23, 2018 video).) Elsewhere, Lutzke calls Steele a "buffoon" and claims he "is ... not playing with a full deck." (*Id.* 71 (quoting a February 23, 2018 video).)

> if someone tries to take a tax deduction on their donation to the Earth Intelligence Network, they themselves could be in legal jeopardy – you should consult your accountant and an attorney before you try to take a tax deduction on any donation made to this fraudulent 501c3. This is a public service announcement to members of the crowdsource community who have been victims of fraud – fraud executed by Robert David Steele.

(*Id.*)  On November 27, 2017, Goodman published a video containing an image of Steele's face superimposed onto a farm animal's rear end.  (*Id.* 65 (containing a screenshot from the video).)  CSTT viewers can purchase t-shirts and coffee mugs featuring this image.  (*Id.* 66.)

In a December 27, 2017 video featuring Goodman, Negron,[48] and Lutzke (as Queen Tut), Defendants discuss the costs Negron has expended on retaining counsel.  Lutzke states that "as soon as" counsel for Plaintiffs takes "any kind of action against Queen Tut," she "will file a complaint with the Virginia State Bar and . . . have his license."  (*Id.* 70 (quoting a December 27, 2017 video).)  Lutzke states that she sent documents to the Court related to this case, although she has not yet made an appearance of any kind.[49]  (*Id.* 72.)

Plaintiffs contend that some of the videos incite violence against Steele.  In one video featuring Goodman and Lutzke, Lutzke directly addresses Steele:  "you're a person who needs to be put down."  (*Id.* 57 (quoting a September 23, 2017 video).)  According to Plaintiffs, Goodman interjects to say "legally speaking," and Lutzke then says:  "legally speaking[,] absolutely legally speaking[,] that you need to be put in a place where you can no longer affect human beings."  (*Id.* (quoting a September 23, 2017 video).)  Goodman and Lutzke published a different video

---

[48] This seems to be Negron's only appearance in a video after the September 1, 2017 filing of this action.

[49] In the February 23, 2018 video, Lutzke alleges she sent her birth certificate to the Court.  (Am. Compl. 72 (quoting a February 23, 2018 video).)  The Court received two anonymous letters on February 21, 2018 and March 1, 2018, one of which included copies of someone's birth certificate.  (ECF Nos. 31, 33.)  The Court, noting that it would "not accept documents sent anonymously and in violation of the Federal and Local Rules of Civil Procedure," restricted the letters, "so that they remain on the record, but are not accessible to the public."  (Mar. 9, 2018 Order 1, ECF No. 35.)

that includes an image of an RV exploding. (*Id.* 59 (containing a screenshot of a September 30, 2017 video).) The side of the flaming RV displays a picture of Steele and McKinney. This image also includes a cartoon figure holding a rifle, with an image of Steele's face superimposed onto the cartoon, standing in the foreground. Plaintiffs further aver that Goodman and Lutzke "disclosed [Steele's] home address to their viewers and subscribers, and used Google Maps to show a photo of [Steele]'s home." (*Id.*)

Since December 2017, Goodman, acting alone, has continued to make allegedly defamatory statements against Plaintiffs. For example, he published at least four videos between February 2018 and April 13, 2018, the date of the filing of this Amended Complaint. (*Id.* 70–73.) Goodman repeats similar accusations of fraud present in earlier videos. (*Id.* 73.)

Lutzke, similarly, has published, through Twitter and videos, negative commentary about Plaintiffs since December 2017. In one Twitter post, Lutzke calls Steele "the greatest plagiarizer and liar on the internet." (*Id.* 78.) And according to Plaintiffs, Lutzke "has now escalated the falsehoods to and [sic] include accusations that [Steele] protects pedophiles, defends child traffickers, wants JIHAD in the United States, has committed 'espionage' and 'treason', and [sic] etc." (*Id.* 75.)

Negron has neither produced nor appeared in any more videos since December 2017. Though not creating content, Plaintiffs aver that Negron continued to conspire with Lutzke to defame Plaintiffs, and that Negron republished some of Lutzke's Twitter publications as part of this conspiracy. (*Id.* 13.)

## II. Analysis: The Motions to Dismiss

### A.      Standard of Review: Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.")  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193.  The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of

the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff' (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)).

## B.    The Court Will Grant in Part and Deny in Part Negron's Motion to Dismiss

Negron's Motion to Dismiss challenges all nine counts of the Amended Complaint. According to Negron, "the Amended Complaint cites only five actual statements in total made by" her, none of which can form the basis of a claim against her. (Mem. Supp. Negron Mot. Dismiss 2, ECF No. 48.) Negron attempts to distinguish her conduct from that of her co-defendants, arguing she cannot be liable for their actions in this case. The Court concludes that Plaintiffs allege sufficient facts for five counts to survive against Negron's Motion to Dismiss: the defamation claim; the statutory conspiracy claim; the common law conspiracy claim; the tortious interference claim; and the intentional infliction of emotional distress claim. The Court will grant Negron's Motion to Dismiss as to the four other claims raised against her: the insulting words claim; the computer claim; the unauthorized use claim; and the request for a permanent injunction.

### 1.    The Defamation Claim Survives Negron's Rule 12(b)(6) Challenge

#### a.    Legal Standard: Defamation *per se*

In Virginia,[50] a plaintiff claiming defamation must allege the "(1) publication[51] (2) of an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005). "To prevail on a claim for defamation, a party must prove by a preponderance of the

---

[50] A court exercising diversity jurisdiction applies the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938).

[51] Defendants, appropriately, do not dispute the publication of the allegedly defamatory statements. "Publication occurs when an actionable statement is transmitted to some third person so as to be heard and understood by such person." *Suarez v. Loomis Armored US, LLC*, No. 3:10cv690, 2010 WL 5101185, at *2 (E.D. Va. Dec. 7, 2010) (citation omitted) (internal quotation marks omitted).

evidence that the allegedly defamatory statements are both false and defamatory, so 'harm[ing] the reputation of another as to lower [her or] him in the estimation of the community or to deter third persons from associating or dealing with [her or] him.'" *Cook, Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Va. Acquisitions LLC*, No. 3:12cv131, 2012 WL 1898616, at *3 (E.D. Va. May 23, 2012) (first alteration in original) (quoting *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). "If the statements at issue are either not defamatory, objectively true, or protected expressions of opinion," no actionable defamation exists. *Id.* at *3 (citing *Am. Commc'ns Network v. Williams*, 568 S.E.2d 683, 686 (Va. 2002)). Virginia makes no distinction between an action for written defamation—*i.e.*, libel—and one for spoken defamation—*i.e.*, slander. *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981).

A statement is defamatory *per se* if, among other circumstances not pertinent here, it "imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of the duties" or "prejudices the party in [his or] her profession or trade." *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 138 n.2 (Va. 1998) (citing *Fleming*, 275 S.E.2d at 635).[52] Otherwise, "to be defamatory, a statement must be more than unpleasant or offensive . . . ." *Hockycko v. Entrodyne Corp.*, No. 6:05cv25, 2005 WL 3132320, at *6 (W.D. Va. Nov. 22, 2005). "Defamatory words 'make the plaintiff appear odious, infamous, or ridiculous.'" *Cutaia v. Radius Eng'g Int'l, Inc.*, No. 5:11cv77, 2012 WL 525471, at *3 (W.D. Va. Feb. 16, 2012) (quoting *Chapin*, 993 F.2d at 1092).

---

[52] To be actionable in the profession or trade context, "a statement must be 'necessarily hurtful in its effect upon plaintiff's business and must affect [her or] him in [her or] his particular trade or occupation,' and there must be 'a nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff.'" *Marroquin v. Exxon Mobil Corp.*, No. 08-391, 2009 WL 1529455, at *9 (E.D. Va. May 27, 2009) (quoting *Fleming*, 275 S.E.2d at 636).

"Pure expressions of opinion, not amounting to 'fighting words,' cannot form the basis of an action for defamation." *Chaves v. Johnson*, 335 S.E.2d 97, 101 (Va. 1985). Such expressions include "speech which does not contain a provably false factual connotation, or . . . which cannot reasonably be interpreted as stating actual facts about a person." *Besen*, 2012 WL 1440183 at *3 (alteration in original) (quoting *Yeagle*, 497 S.E.2d at 137); *see also Harrell v. Colonial Holdings, Inc.*, 923 F. Supp. 2d 813, 823 (E.D. Va. 2013) ("Statements of opinion are generally not actionable, because such statements cannot be objectively characterized as true or false." (citing *Jordan*, 612 S.E.2d at 206)). Expressions of opinion include "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint." *Jordan*, 612 S.E.2d at 206 (citation omitted). Similarly, "rhetorical hyperbole, even if insulting, offensive, or otherwise inappropriate, is not actionable." *Choi v. Kyu Chul Lee*, 312 Fed. Appx. 551, 553 (4th Cir. 2009) (internal quotation marks and citations omitted).

Nonetheless, "[d]efendants can be held liable for defamation 'when a negative characterization of a person is coupled with a clear but false implication that the [speaker] is privy to facts about the person that are unknown to the general [listener]." *Baylor v. Comprehensive Pain Mgmt. Ctrs., Inc.*, No. 7:09cv00472, 2011 WL 1327396, at *11 (W.D. Va. Apr. 6, 2011) (quoting Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 4:3.2 (4th ed. 2010)). "The test for determining whether facts that may be actionable defamation have been implied is 'whether a reasonable listener would take [the speaker] to be basing [her or] his 'opinion' on knowledge of facts of the sort than can be evaluated in a defamation suit." *Id.* (citing Sack, *supra*, § 4:3.2).

Although the Supreme Court of the United States has not provided a categorical protection for *all* expressions of opinion,[53] a statement merits protection if it "cannot 'reasonably [be] interpreted as stating actual facts about an individual.'" *Milkovich*, 497 U.S. at 20 (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)); *see also Snyder v. Phelps*, 580 F.3d 206, 218–19 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011). To determine whether a statement posits facts, the United States Court of Appeals for the Fourth Circuit directs courts to look to the actual language used, as well as the context and general tenor of the statement. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (citing *Milkovich*, 497 U.S. at 21); *see also Snyder*, 580 F.3d at 219–20 (explaining that courts *must* consider the context of an allegedly defamatory statement when analyzing whether the statement constitutes opinion). The Supreme Court of Virginia similarly requires an examination of context. *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (Va. 2009) ("In determining whether a statement is one of fact or opinion, a court may not isolate one portion of the statement at issue from another portion of the statement . . . . Rather, a court must consider the statement as a whole."). The Court determines as a matter of law whether a statement "is one of fact or one of opinion." *Chaves*, 335 S.E.2d at 102.

The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought. *Suarez*, 2010 WL 5101185 at *2. Under Virginia law, a private figure must make a showing that the defendant "published the statement knowing that it was 'false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the

---

[53] "Causes of action for defamation have their basis in state common law but are subject to principles of freedom of speech arising under the First Amendment to the United States Constitution and Article I, Section 12 of the Constitution of Virginia." *Yeagle*, 497 S.E.2d at 137.

publication was based.'" *Sepmoree*, 2014 WL 4444435 at *7 (quoting *Gazette Inc. v. Harris*, 325 S.E.2d 713, 724–25 (Va. 1985)). As to a public figure, on the other hand, a plaintiff must ultimately prove that the defendant made the statement with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). The Supreme Court of Virginia has stated that a plaintiff must "demonstrate by clear and convincing evidence that the defendant realized that [her or] his statement was false or that [she or] he subjectively entertained serious doubt as to the truth of [her or] his statement." *Jordan*, 269 Va. at 577.

### b. Plaintiffs' Defamation Claim Survives Challenge

Negron challenges the defamation claim, stating that her statements "were made in the spirit of perceived legitimate criticism, were mere opinion, and are not defamatory." (Mem. Supp. Negron Mot. Dismiss 9.) Specifically, Negron argues that Plaintiffs' allegations fail to meet two prongs of Virginia's defamation test because these statements do not constitute actionable statements, and because Plaintiffs have not proven the requisite level of intent. Because both arguments fail with regard to some of Negron's statements, the defamation claim survives this Rule 12(b)(6) challenge.

First, Negron argues that the statements attributed to her constitute non-actionable opinions.[54] Negron excerpts portions of the Amended Complaint containing statements by

---

[54] Negron posits that "Steele has made or at least been attributed with numerous more eccentric claims through appearances on conspiracy programs . . . . Plaintiffs should experience no surprise when some individuals disagree with their beliefs." (Mem. Supp. Negron Mot. Dismiss 3.) For example, "on a widely known conspiracy show, Plaintiff Steele appears to state that there is a colony on Mars populated by children kidnapped by NASA." (*Id.* 3 n.2.)

This information about Steele, even if accurate, does not pertain to the instant action and falls well beyond the scope of this analysis. Plaintiffs' Amended Complaint alleges that Plaintiffs operate a non-profit engaged in some kind of electoral reform and peace-seeking

Negron—five in total—and argues that Negron's "claims are subjective and incapable of definitively being proven false." (*Id.* 11.) Although many of Negron's statements cannot constitute actionable defamation, several do.[55]

Negron referred to Steele as "a serious con man" and called the UNRIG project "a serious fraud. I mean that it is a fraud. No question." (Am. Compl. 46 (quoting an August 26, 2017 video).) Negron claims these constitute opinion statements which cannot be proven true or false. The Court disagrees.

In *Choi v. Kyu Chul Lee*, the Fourth Circuit considered whether the words "gangster" or "thug" could form the basis of a defamation suit. 312 Fed. Appx. at 553. The *Choi* court acknowledged *some* uses of these words as hyperbolic, but that other uses of these words purported to state actual facts about the plaintiff. *Id.* Specifically, the newspaper columns at issue alleged "that Choi accepted a bribe to appoint someone to a board and accepted money to conceal the whereabouts of and generally look after a woman alleged to be the illegitimate daughter of the South Korean premier." *Id.* Given this context, the Fourth Circuit concluded "that the descriptions of Choi as a gangster can reasonably be understood as stating actual facts about Choi." *Id.*

Similarly, the context here drives the Court's conclusion that Negron's statements constitute actionable statements. References to Steele as a "con man" and to UNRIG as a "fraud" do not exist in a vacuum or only as part of a litany of generic insults. Instead, the

---

mission—none of which appears to have anything to do with the "eccentric" claims Negron attributes to Steele.

[55] "Defamation must be pled with particularity under Virginia law. . . . However, when a state claim is brought in federal court, a plaintiff need not satisfy the state's heightened pleading requirements to survive a Rule 12(b)(6) motion; the Federal Rules of Civil Procedure govern this pleading." *Skillstorm, Inc. v. Electronic Data Sys., LLC*, 666 F. Supp. 2d 610, 619 n.1 (E.D. Va. 2009).

context in which Negron made the statements unmistakably indicates that Negron joined in and adopted as her own Goodman and Lutzke's accusations that Plaintiffs used EIN donations to personally benefit Steele, thus defrauding CSTT viewers who donated to EIN (through UNRIG). Because Plaintiffs contend that they accounted for "every penny" donated to EIN, (Am. Compl. 86), Negron's statements can be proven true or false, rendering them actionable. *See Harrell*, 923 F. Supp. 2d at 823.

Negron argues, alternatively, that she lacked the requisite intent for Plaintiffs to prevail. Negron alleges that Steele presents as a public figure for the purpose of this defamation suit. Plaintiffs do not dispute this characterization. (Resp. Mot. Dismiss 22, ECF No. 53 (arguing that the Amended Complaint sufficiently states actual malice).) More importantly, even viewing the allegations in the Amended Complaint in the light most favorable to Plaintiffs, Steele certainly presents as a public figure for purposes of a defamation claim.[56]

Because Steele is a public figure, to prevail in their defamation claim, Plaintiffs must ultimately prove that Negron made the statements with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 280.

According to Negron, Plaintiffs do not plead facts "to establish anything other than that Ms. Negron believed the truth of her statements." (Mem. Supp. Negron Mot. Dismiss 8.) But Plaintiffs plead just enough facts, at this deferential stage, to support the conclusion that Negron acted with reckless disregard for the truth of her statements. Plaintiffs contend that "Defendants'

---

[56] Steele identified himself as the co-founder and a leader of EIN and the #UNRIG project, which aimed to "communicate to all citizens the possibility of an ethical, legal, non-violent restoration of integrity to the United States Government." (Am. Compl. 9.) In this role, Steele represented the #UNRIG project in a "national tour of the [c]ountry." (*Id.* 86.) Steele made himself answerable to donors, and "communicated with all" of them. (*Id.* 86.) Nothing in the current record indicates that Steele acted as a private figure during these events.

own videos . . . demonstrate that they actively reviewed Plaintiffs' websites and learned all about

the #UNRIG campaign." (Am. Compl. 87.) Plaintiffs contend that the #UNRIG campaign

"accounted for every penny spent in a budget that was posted online." (*Id.* 86 (providing a

link).) These minimal allegations suffice—at least at this stage—to plausibly show that that

Negron made these statements with actual malice. *Jordan*, 269 Va. at 577. Because Plaintiffs

plausibly plead facts in support of their claim that Negron made defamatory statements about

them, the defamation claim will proceed.[57]

## 2.  The Court Will Dismiss the Insulting Words Claim[58]

In Virginia, "[a]ll words shall be actionable which from their usual construction and

common acceptance are construed as insults and tend to violence and breach of the peace." Va.

Code Ann. § 8.01-45. Even drawing all reasonable inferences in favor of Plaintiffs, as the Court

must, the Amended Complaint lacks any allegation that Negron made any statements tending

toward violence. The Court will dismiss the insulting words claim against Negron.[59]

---

[57] Although some of Negron's statements constitute actionable defamation, several do not. The Amended Complaint contains allegations that Negron described Steele's body language as "deeply disturbing" and "suggest[ing] . . . ulterior motives." (Am. Compl. 40 (quoting an August 13, 2017 video).) Similarly, Negron describes Steele as "predatory in nature." (*Id.*) Negron's Motion to Dismiss challenges these statements as non-actionable opinions. Expressions of opinion include "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint." *Jordan*, 612 S.E.2d at 206 (citation omitted). Reviewing the quotations in the context of the Amended Complaint, the Court concludes these statements amount to non-actionable opinion statements.

[58] Although the Virginia insulting words cause of action has been interpreted as "virtually coextensive with the common law action for defamation," *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 670 (E.D. Va. 2015), the Court addresses this cause of action separately because it contains unique elements, such as statements that tend toward violence, which result in its ultimate dismissal.

[59] Plaintiffs allege that "[m]any of the Goodman/Lutzke video productions promoted and encouraged violence against Plaintiffs." (Am. Compl. 59.) Although Plaintiffs purport to bring this insulting words claim against all three defendants, Plaintiffs make no allegations against

27

### 3.     The Statutory Conspiracy Claim Survives

Virginia law provides a civil cause of action for "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever. . . ." VA. CODE ANN. §§ 18.2-499(A); 18.2-500 (providing damages and fees).  To prevail on this claim, Plaintiffs must ultimately prove, by clear and convincing evidence, that (1) Negron "attempted to conspire with one or more of the other defendants to harm [Plaintiffs]; (2) [Negron] acted with legal malice towards [Plaintiffs]; and (3) the conspiratorial actions of [Negron] and one or more of the other defendants caused [Plaintiffs] to suffer damages."[60] *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Co.*, 108 F.3d 522, 526 (4th Cir. 1997).

In challenging this claim, Negron states that "Virginia law mandates that 'there can be no conspiracy to do an act the law allows.'"  (Mem. Supp. Negron Mot. Dismiss 17–18 (quoting *Hechler Chevrolet v. Gen. Motors Corp.*, 230 Va. 396, 402 (1985)).)  According to Negron, the statutory conspiracy must fail because the defamation claim fails.  Because the Court concludes that the defamation claim survives Negron's Motion to Dismiss, this argument cannot prevail.

Negron also states that the Amended Complaint "provides no substantive allegations regarding a conspiracy between Co-Defendants and Ms. Negron outside of her appearance on Goodman's video[s]."  (*Id.* 18.)  But Plaintiffs allege that "Goodman, Negron and Lutzke intentionally set out to destroy Plaintiffs' reputation with falsehoods."  (Am. Compl. 86.)  To this

---

Negron specifically, and they do not rebut her challenge in their Response to Negron's Motion to Dismiss.

[60] Negron does not challenge the damages element of the test.  Plaintiffs allege that, as a result of Defendants' action, EIN suffered a sharp decrease in donations and donors asked for refunds.

end, Goodman and Negron co-produced a number of videos containing defamatory statements about Plaintiffs. Goodman and Negron "scripted" the videos ahead of time. (*Id.* 22.) According to Plaintiffs, Goodman and Negron "discussed the subject matter and content via email, telephone and/or text message. They agreed upon the thesis, theme and tone. Goodman and Negron [spoke] with one voice."[61] (*Id.*) Negron appeared in multiple CSTT videos, including both in-person appearances with Goodman and electronic appearances through video conferencing. One of the videos that Negron allegedly co-produced featured Goodman and Negron at her home. Taken together, these allegations suffice to plausibly show the existence of an agreement to "willfully and maliciously injur[e]" Plaintiffs. VA. CODE ANN. § 18.2-499(A). And as stated above, Plaintiffs adequately plead malice and damages, satisfying the second and third prongs of the statutory conspiracy test. *Multi-Channel*, 108 F.3d at 526. Although these facts could not, on their own, satisfy Plaintiffs' ultimate heightened pleading standard, they suffice to meet the plausibility standard applicable to Negron's Rule 12(b)(6) motion. *See Iqbal*, 556 U.S. at 678–79.

### 4.      The Common Law Conspiracy Claim Survives

To allege common law conspiracy, a plaintiff "must show 1) an agreement between two or more persons; 2) to participate in an unlawful act[…]; 3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and 4) that the overt act was done pursuant to and in furtherance of the common scheme." *Skillstorm*, 666 F. Supp. 2d at 618.

Negron argues generally, without challenging specific elements, that the Amended Complaint fails to satisfy the test for common law conspiracy. As described above, Plaintiffs

---

[61] Negron claims that Plaintiffs "attribute[e] to her actions she never took." (Mem. Supp. Negron Mot. Dismiss 15.) At this procedural stage, the Court must take Plaintiffs well-pleaded factual allegations as true. *Kensington*, 684 F.3d at 467 (citations omitted).

Plaintiffs delineate Negron's alleged participation in the production and planning of these videos, meeting their plausibility standard. *See Iqbal*, 556 U.S. at 678–79.

adequately plead (1) the existence of an agreement between Negron and Goodman (2) to defame Plaintiffs, resulting in the production and publication of allegedly defamatory videos that (3) caused Plaintiffs damages. Negron's participation in the production and publication of the videos constitutes an overt act to satisfy the fourth and final prong of the common law conspiracy claim. Because Plaintiffs plead sufficient facts to establish each element of the test, the common law conspiracy claim survives Negron's Rule 12(b)(6) challenge.

### 5. The Tortious Interference Claim Survives

To prevail on a claim for tortious interference with a contractual relation in Virginia, a plaintiff must prove four elements: "(1) the existence of a valid contractual relationship[…]; (2) knowledge of the relationship[…] on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship[…]; and (4) resultant damage to the party whose relationship ... has been disrupted." *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 210 (4th Cir. 2001).

Negron argues that Plaintiffs cannot base their claim "on a general, unspecified loss of customers or viewers." (Mem. Supp. Negron Mot. Dismiss 19.) Focusing on the general "harm to nondescript donors or subscribers," Negron argues that this claim must fail due to a lack of specificity. (*Id.*) Negron's analysis misapplies the applicable standard to the facts.

Plaintiffs allege that Defendants, including Negron, interfered with a contract that existed between Plaintiffs and donors. Specifically, donors provided funds to EIN in exchange for EIN carrying out its mission. For the purpose of Negron's Motion to Dismiss, this plausibly alleges the existence of a contractual relationship.[62] Defendants, through their allegedly defamatory statements, accused Plaintiffs of fraud and theft. Defendants then encouraged CSTT viewers to

---

[62] Negron does not challenge Plaintiffs' description of this relationship as contractual.

demand refunds from Plaintiffs, which some viewers did.[63]  Plaintiffs do not rely on a general

expectation of diminishing donations or a general concern about the financial effect of

Defendants' actions.  Instead, Plaintiffs provide copies of alleged communications by donors,

requesting refunds based on Defendants' videos—many of which Negron co-produced with

Goodman.  Plaintiffs conclude that, after Defendants published the videos, donations dropped

from over $29,000 a month to around $200.[64]  These facts plausibly allege "intentional

interference inducing or causing a breach or termination of the relationship" and damages.

*Worldwide*, 249 F.3d at 210.  Because Plaintiffs allege plausible facts to support their tortious

interference claim against Negron, the Court will deny Negron's Motion to Dismiss as to this

claim.

### 6.  The Intentional Infliction of Emotional Distress Count Survives

Under Virginia law, a plaintiff can only recover for intentional infliction of emotional

distress "when the emotional distress is extreme, and only where the distress inflicted is so

severe that no reasonable person could be expected to endure it."  *Daniczek v. Spencer*, 156 F.

Supp. 3d 739, 757 (E.D. Va. 2016) (quoting *Russo v. White*, 241 Va. 23, 27 (1991)).

"[I]ntentional infliction of emotional distress is disfavored, though not completely barred, at

Virginia law."  *Id.* at 758.  Although a plaintiff in a Virginia state court "must plead with the

---

[63] These allegations sufficiently plead the second prong of the analysis, "knowledge of the [contractual] relationship" by Negron.  *Worldwide*, 249 F.3d at 210.

[64] Negron argues that "the loss of donations to [UNRIG] was publicly attributed to other sources by Plaintiff Steele himself."  (Mem. Supp. Negron Mot. Dismiss 22.)  Negron claims that Plaintiffs' website states that UNRIG's "funding collapsed based on (1) partner Cynthia McKinney not being able to leave her job in Bangladesh, and (2) a major Deep State/Zionist-led attack, with no mention of Ms. Negron's conduct."  (*Id.* (providing a link).)

Although this information may ultimately affect Plaintiffs' ability to recover under this claim, the Court cannot consider it when evaluating the instant motion.  At this procedural stage, the Court must take Plaintiffs well-pleaded allegations as true.  *Kensington*, 684 F.3d at 467 (citations omitted).

requisite degree of specificity the facts giving rise to [her or] his claim of severe emotional distress," a plaintiff in a Virginia federal court sitting in diversity need only meet the pleading standard set forth in Federal Rule of Civil Procedure 8 to survive a Rule 12(b)(6) motion. *Id.* at 759 (quotation omitted).

Negron's Motion to Dismiss argues that "Steele fails to state actionable conduct against Ms. Negron [based on Negron's arguments against the defamation claim], and accordingly[,] his piggyback emotional distress claim cannot succeed." (Mem. Supp. Negron Mot. Dismiss 23.) Having found that the defamation claim may proceed, this argument cannot prevail.

Negron argues that Steele failed to adequately plead facts in support of his claim for emotional distress because he does not speak to the severity of his distress. (Mem. Supp. Mot. Dismiss 23.) The Court finds otherwise. Though minimal, the Amended Complaint contains sufficient allegations for purposes of the instant motion. Plaintiffs contend that, as a result of Defendants' actions, Steele experienced "pain and suffering, physical injury,[65] severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, [and] injury to reputation." (Am. Compl. 93.) Plaintiffs aver that Steele's "honor has been stolen. His name and reputation have been publicly impugned" by Defendants' defamatory statements. (*Id.* 83.) Throughout the Amended Complaint, Plaintiffs refer to Defendants' actions as embarrassing, humiliating, and injurious to Plaintiffs and their reputations: "Goodman, Negron and Lutzke's false statements have permanently and irreparably harmed Plaintiffs and their reputations." (*Id.* 85.)

---

[65] Plaintiffs do not elaborate as to the physical injury Steele suffered, and nothing in the Amended Complaint appears to support this particular allegation. Although the Court disregards that allegation as conclusory, this finding does not affect the outcome on the motions at bar.

These meager allegations just suffice to survive this Rule 12(b)(6) challenge. *See Hatfill*, 416 F.3d at 337.[66]

At this early stage, the Court cannot conclude that Plaintiffs could not prevail on this claim. Plaintiffs sufficiently plead facts in support of their claim for intentional infliction of emotional distress. The Court will deny Negron's Motion to Dismiss with regard to this claim.

### 7. The Court Will Dismiss the Computer Claims, the Unauthorized Use Claims, and the Permanent Injunction as to Negron

Negron challenged Count VII (the computer claim), Count VIII (the unauthorized use claim), and Count IX (seeking a permanent injunction) as failing to state a claim. In response, Plaintiffs do not oppose dismissing these claims against Negron. Plaintiffs concede that "[t]hese Counts are more properly directed to Goodman and Lutzke." (Resp. Negron Mot. Dismiss 29, ECF No. 53.) Based on the parties' agreement, and finding it proper to do so, the Court will dismiss these three counts against Negron.

### C. The Court Will Deny Goodman's Motion to Dismiss

Goodman, proceeding *pro se*, also challenges the Amended Complaint. Unlike Negron's Motion to Dismiss, Goodman does not challenge all nine counts pled against him. Even liberally construing Goodman's Motion to Dismiss, as the Court must when evaluating a *pro se* party's motion, Goodman raises three arguments challenging the Amended Complaint. *See Deabreu v. Novastar Home Mortg., Inc.*, 536 F. App'x 373, 375 (4th Cir. 2013) (citations omitted); *see also Gordon v. Leeke*, 574 F.2d 1147, 1153 (4th Cir. 1978). First, Goodman invokes Virginia Code

---

[66] The complaint in *Hatfill* alleged that "[a]s a result of defendants' defamation here at issue, Dr. Hatfill has suffered severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, severe emotional distress and other injury." 416 F.3d at 337.

§ 8.01-223.2 (the "Immunity Provision"),[67] which could create a possible defense for Count I (the defamation claim), Count III (the statutory conspiracy claim), and Count V (the tortious interference claim).[68]  Next, Goodman argues the Amended Complaint fails to show "actual malice."  Finally, Goodman disputes the facts as Plaintiffs allege them.  For the reasons below, each argument fails at this stage.

As to his first challenge under the Immunity Provision, Goodman cannot avail himself of its protection on this record.  By its terms, the Immunity Provision "shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false."  VA. CODE ANN. § 8.01-223.2.

But the Amended Complaint is replete with assertions that Goodman made the multitude of statements with actual knowledge of their falsity.  Plaintiffs allege that, "[d]espite their actual knowledge to the contrary, [Defendants] published false and defamatory statements that #UNRIG was a 'scam' and that Plaintiffs were defrauding and stealing from donors."  (Am.

---

[67] This provision states:

A person shall be immune from civil liability for a violation of § 18.2-499, a claim of tortious interference with an existing contract or a business or contractual expectancy, or a claim of defamation based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party . . . .  The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

VA. CODE ANN. § 8.01-223.2.

[68] Goodman does not challenge Count II (the insulting words claim), Count IV (the common law conspiracy claim), Count VI (the intentional infliction of emotional distress claim), Count VII (the computer claims), Count VIII (the unauthorized use claim), or Count IX (seeking a permanent injunction).  These claims will proceed.

Compl. 88.)  Defendants, including Goodman, "intentionally ignored online evidence . . . that proved their statements about [Steele] were false."  (*Id.*)

Specifically, Plaintiffs contend that "Defendants' own videos . . . demonstrate that they actively reviewed Plaintiffs' websites and learned all about the #UNRIG campaign."  (Am. Compl. 87.)  Plaintiffs contend that the #UNRIG campaign "accounted for every penny spent in a budget that was posted online."  (*Id.* 86 (providing a link).)  These allegations plausibly support a conclusion that Goodman made the statements with knowledge of their falsity or with a reckless disregard as to their veracity.  *See Iqbal*, 556 U.S. at 678–79; *see also* VA. CODE ANN. § 8.01-223.2.

Second, Goodman argues that he lacked actual malice.  To show actual malice, Plaintiffs, as public figures, must ultimately prove that Goodman made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co.*, 376 U.S. at 280.

But at this early juncture, the allegations against Goodman support a finding that Plaintiffs adequately allege malice on behalf of Defendants, including Goodman.  Goodman argues that "[f]ederal courts also routinely grant anti-SLAPP motions in cases involving the media where, as here, the reporter's newsgathering plainly demonstrates a lack of actual malice." (Goodman Mot. Dismiss 4, ECF No. 45.)  But taking Plaintiffs' well-pleaded allegations as true, the Court concludes that Plaintiffs allege facts sufficient to support their claim that Goodman made his statements with actual malice.

Plaintiffs aver that Goodman undertook this "smear campaign" as "retaliation" for Steele distancing himself from Goodman.  (Am. Compl. 20.)  Immediately after Steele cancelled an interview appearance on Goodman's CSTT production, Goodman produced and published

dozens of videos insulting Steele and EIN and accusing them of fraud. According to Plaintiffs, Steele enjoyed a pristine reputation before these videos. This plausibly supports Plaintiffs' claim that Goodman acted in retaliation after Steele canceled a scheduled interview.

Plaintiffs contend that, despite familiarity with Plaintiffs' websites and access to Plaintiffs' publicly-available online financial records, Defendants used these videos to claim—without evidence—that Plaintiffs defrauded donors. Goodman encouraged CSTT viewers to ask Plaintiffs for refunds for donations made, informing these donors that they may face "legal jeopardy" for their contributions to EIN and its #UNRIG campaign. (*Id.* 61.)

Finally, Goodman argues in his Reply to Plaintiffs' Response opposing Goodman's Motion to Dismiss, that "the statements are true. They are based on fact, supported by evidence." (Reply Goodman Mot. Dismiss 1, ECF No. 52.) Goodman cannot prevail on the defense of "truth" due to the deference the Court must give Plaintiffs' allegations at this procedural stage. *See Kensington*, 684 F.3d at 467. Although Goodman may later raise this defense and challenge Plaintiffs' factual allegations, he cannot do so at this procedural juncture.

At this stage, Plaintiffs plead sufficient facts to show that Goodman cannot avail himself of the protections of the Immunity Provision and to establish malice for purposes of Goodman's Motion to Dismiss.[69] Goodman cannot dispute well-pleaded facts in a Rule 12(b)(6) motion to dismiss. Because each of Goodman's arguments in Goodman's Motion to Dismiss turn on the Immunity Provision, an absence of malice, and disputing the facts as Plaintiffs plead them, the Court will deny Goodman's Motion to Dismiss.

---

[69] This finding does not preclude Goodman from raising the same defense on a more developed record.

### D.    **Summary of Claims Surviving Rule 12(b)(6) Scrutiny**

As to Negron, the Court will deny in part and grant in part Negron's Motion to Dismiss. Five of the nine claims will proceed against Negron:  the defamation claim; the statutory conspiracy claim; the common law conspiracy claim; the tortious interference claim; and the intentional infliction of emotional distress claim.  However, the Court will dismiss the following four counts against Negron:  the insulting words claim; the computer claims; the unauthorized use claim; and the request for a permanent injunction.

As to Goodman, the Court will deny Goodman's Motion to Dismiss.  All nine claims against Goodman will proceed.

## III.  Analysis:  Motion to Sever

In addition to Goodman's Motion to Dismiss, Goodman filed a Motion to Sever, asking to "sever his trial from that of his [c]odefendants" Negron and Lutzke.  (Mot. Sever 1, ECF No. 46.)  The Federal Rules of Civil Procedure govern severance.  Goodman invokes two rules in his Motion to Sever:  Rule 21, which does not apply,[70] and Rule 42.  Rule 42 states, in relevant part: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Fed. R. Civ. P. 42(b).

In support of his Motion to Sever, Goodman claims that Plaintiff Steele and Defendant Lutzke have conspired against him to bring this action.  He raises numerous allegations related to Steele's motivations in bringing this lawsuit.  Goodman also accuses Lutzke of filing false

---

[70] Rule 21 governs the misjoinder and nonjoinder of parties.  Fed. R. Civ. P. 21. Goodman does not claim that any party constitutes a misjoined or nonjoined party, so Rule 21 does not apply.

paperwork with the Court. Goodman does not cite to any case law in support of his Motion to Sever.

The Court, considering the record before it, cannot conclude that separate trials would increase convenience, avoid prejudice, or expedite and economize judicial resolution to this matter. The Court will deny the Motion to Sever.

### IV. Conclusion

The Court considered five motions: Negron's Motion to Dismiss; Goodman's Motion to Dismiss; Goodman's Motion to Sever; Goodman's Ghost Writing Motion; and Sweigert's Motion to Intervene.

The Court will grant in part and deny in part Negron's Motion to Dismiss. As to Negron, the following five claims will proceed:

| | |
|---|---|
| **Count I:** | Defamation *per se* (the defamation claim); |
| **Count III:** | Business conspiracy, in violation of Virginia Code § 18.2-499 and Va Code § 18.2-500 (the statutory conspiracy claim); |
| **Count IV:** | Common law conspiracy; |
| **Count V:** | Tortious interference; and, |
| **Count VI:** | Intentional Infliction of Emotional Distress. |

However, the Court will dismiss the following four counts against Negron:

| | |
|---|---|
| **Count II:** | Insulting words, in violation of Virginia Code § 8.01-45 (the insulting words claim); |
| **Count VII:** | Personal trespass by computer in violation of Virginia Code § 18.2-152.7 and computer harassment in violation of Virginia Code § 18.2-152.7:1 (the computer claim); |
| **Count VIII:** | Unauthorized use of name and picture in violation of Virginia Code § 8.01-40 (the unauthorized use claim); and, |
| **Count IX:** | Permanent injunction. |

The Court will deny Goodman's Motion to Dismiss. All nine claims against Goodman will proceed.

The Court will also deny Goodman's Motion to Sever. The Court will grant Goodman's Ghost Writing Motion, and will deem the February 13, 2019 Ghost Writing Form filed. As to Sweigert's Motion to Intervene, the Court will grant Sweigert leave to file an Amended Motion to Intervene. Finally, the Court will strike several non-party filings from the record.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 3/31/19
Richmond, Virginia