

FILED
MAR 2 9 2019
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND VIRGINIA

ROBERT DAVID STEELE,

                Plaintiff,

      -against-

JASON GOODMAN,

                Defendant.

**17-CV-00601-MHL**

**AMENDED MOTION TO
INTERVENE BY INTERVENOR-
APPLICANT SWEIGERT**

## AMENDED MOTION TO INTERVENE BY INTERVENOR-APPLICANT SWEIGERT

### PROCEDURAL STATEMENT

1.    NOTICE SHOULD BE TAKEN BY THE CLERK OF THE COURT AND ALL

PARTIES that the interested party known as D. GEORGE SWEIGERT is seeking the LEAVE

OF THE COURT TO INTERVENE into this instant lawsuit pursuant to Fed. R. Civ. Proc. Rule

24(a) and Virginia Supreme Court Rule 3:14 (Rule 3:14 provides that "[a] new party may by

leave of court file a pleading to intervene as a plaintiff or defendant to assert any claim or

defense germane to the subject matter of the proceeding.").

2.    This instant pleading amends and supplements docket no. 72 (2/19/2018) pursuant to the

2009 Revisions to Fed. R. Civ. Proc. Rule 15(a).

3.    The interested party (intervenor-applicant) D. George Sweigert purposes to intervene as a

**PLAINTIFF.** As sworn below, Sweigert has an interest identical to the Plaintiff (Robert David

Steele) in these proceedings and maintains an interest in their outcome.

4.    As no discovery has taken place and these proceedings are in the pleading stages, this

MOTION appears timely and does not present a prejudicial burden to any party.

## PRELIMINARY STATEMENT

1.      At the outset, the undersigned apologizes for the length of the following preliminary

statement; however, it is required to demonstrate the same nucleus of facts that form a nexus

between Defendant Goodman's conduct, the undersigned and this Court.

2.      *Background.* As a leading *alt-right* media star and <u>all-purpose public figure</u>, Defendant

(herein Def) operates CrowdSource The Truth (CSTT) [trademarked] on several social media

platforms.  CSTT claims to be a fact-checking news service; but, operates akin to a methodology

used in nation state cyber conflict known as "Information Operations [Info Ops]" to destroy

political enemies.  The Def's proficiency at sowing deceptive falsehoods, mixed with a few

grains of truth, into CSTT *news* podcasts accomplishes the Info Ops objectives of

disempowerment, disruption, degrading and de-personage of a target (like the undersigned).

Innocent parties (collateral damage) become CSTT on-line punching bags to increase Def's

personal profits while he recklessly deflects blame, ownership and responsibility of his acts onto

these innocents (see Port of Charleston dirty bomb hoax closure supervised by the Def on June

14, 2017 via CSTT podcasts).  [It is instructive to note the definition of cyber adversaries in

**Exhibit M**, page 36-39, docket no. 82 (**pgs.36-39,dkt.82**), incorporated as if fully restated

herein].  For more information on the dirty bomb hoax port closure see *Report: The Port of*

*Charleston Dirty Bomb Hoax and Social Media Liability* , Amazon Paperback – April 14, 2018;

quoted in relevant part (book description on Amazon):

> The only report that has ever been written about the Port of Charleston, S.C. Dirty
>
> Bomb Hoax of June 14, 2017. This booklet describes how social media hoax
>
> news sites can attack America's critical infrastructure. Seemingly, these deception
>
> merchants operate with no threat of legal action. This fertile environment has
>
> allowed the consequence-free attacks on maritime ports, generation of hysteria of

2

supposed assassination plots, and generate fear over unsafe consumer products.
The next generation of cyber attack tools will be based upon Artificial
Intelligence and can execute complex social media attacks. Law enforcement is
falling further behind the tip of the spear in comprehending the cyber warfare
nature of these attach techniques.

3.    The Def's CSTT enterprise (responsible for the Port of Charleston closure) purportedly
collects between $10K and $15K monthly from over 1,000 dubious paying "patrons" (see
Patreon.Com) transmitted over the wires via the global payment system. Donations and
contributions to the Def are to ostensibly fund CSTT *investigation reports on podcasts* – which
can be categorically characterized as false news, distortions of reality, deceptive and often
resembling hoaxes such as screaming "fire" in a crowded theater (dirty bomb hoax). Quoting the
Patreon.com web-site in relevant part:

> Note: ***We bill your patrons on the 1st of each month at midnight in the pacific time***
> ***zone– payments process throughout the day on the 1st of each month PST.*** *Processing*
> *payments in bulk helps keep processing fees lower.*
>
> (https://support.patreon.com/hc/en-us/articles/
> 209777053-When-will-my-patrons-be-billed- )

4.    Def (and a newly identified co-conspirator) broadcast in a pervasive manner deceptive
and defamatory statements to injure the perceived enemies of the Def's CSTT enterprise. Def
uses his extensive CSTT social media empire in his private war against CSTT enemies. This
includes Def's perverted insinuations that the undersigned is (1) protecting pedophiles, (2)
practicing ritualistic satanic torture, (3) stalking CSTT reporters with death squads, (4) was a
planner of the Port hoax and (5) is a drug smuggler. Def insists that these slurs are based on the

3

*evidence* that *resulted* from CSTT *investigations*. This explains why it is, and was, so damaging and dangerous, when Def defames and incites on-line calls to violence and intimidation directed at CSTT targets (like the undersigned). Caveat: for more information on the corporate status of CSTT and Def's **Multimedia System Design, Inc.** see [dkt.no. 54].

5.     *Defendant's incitement of violence against undersigned.* The Def has broadcast CSTT *investigation results* to accuse the undersigned of murdering hitchhikers as part of witchcraft practices, protecting pedophiles, coordinating satanic ritualistic abuse on victims, etc. These deceptive and vile accusations were passed off as the *results of investigative research*, inciting a digital lynch mob to harm the undersigned. Defaming and inciting violence against the undersigned was not done in the public's interest. In fact, none of Def's infringing content has been removed (nearly 14 months later and counting), and remains available to the public worldwide. "[I]ncitement creates a risk that third parties will inflict violence on the victim, whereas threats engender fear and intimidation that usually reach the victim directly." *United States v. Turner*, 720 F.3d 411 (2d Cir. 2013). [emphasis added] "It rarely has been suggested that the constitution freedom for speech ... extends immunity to speech or writing used as an integral part of conduct in violation of a valid ... statute." *United States v. Rowlee II*, 899 F.2d 1275, 1278 (2d Cir. 1990).

6.     Two associates of the Def are sources of great concern to the undersigned: Michael Bardon of Avondale, AZ and Quinn Michaels (aka Korey Atkin) (whereabouts believed to be Las Vegas, NV). Bardon is awaiting sentencing in the Arizona state courts for aggregated assault with a firearm (Maricopa County Court, AZ). Meanwhile, Michaels conducts, in a pervasive manner, smear campaigns against his former girl friend and her son. Both Bardon/Michaels have been seen as sidekicks and co-hosts with the Def on the CSTT social

media podcasts. Both have co-produced videos with the Def. Both operate independent YouTube and social media channels with subscribers and "groupies" that follow the daily minutia of their respective lives.

7.      In the case of Bardon, the Def spent several days at Bardon's home and accompanied him to his state court sentencing hearing. Immediately following the latest hearing at the Maricopa County Courthouse Def released several videos accusing the undersigned of mail fraud, criminal interference, etc. In these video podcasts the Def pinned the responsibility of Bardon's legal troubles onto the undersigned. This situation has culminated in Bardon filing fictious police reports with the Avondale Police Department that the undersigned has been "stalking" him. Such fraudulent "stalking" accusations are the hallmark of the CSTT smear campaigns. The Court will note that the Def is fond of complaining about his own "stalking" stories (see [dkt.no.78]).

8.      In his attempt to incite violence against the undersigned, Def claimed that he had evidence that the undersigned had knowledge of the exact location of Michaels when Michaels suffered a life-threatening burst bleb on his lung. While Michaels was in the hospital Def flew to his side in New Mexico (Christmas, 2017). Def demonstrated how to disassembly a hotel microwave and modify it to spread spectrum microwave signals into an adjoining room for the purposes of exploding a bleb (totality discredited and denied by the attending surgeon of Michaels). Def insinuated that the undersigned had attempted to inflict physical damage and/or murder on Michaels using this method, etc. Def also stated he was communicating with the Roswell Police Department about the undersigned's odd movements prior to the incident.

9.      At the Def's direction, Michaels then spent six weeks at Mount Shasta, California illegally camping while searching for the undersigned. This included video productions and

5

podcasts that feature Def with Michaels.  Video podcasts during that time (April – May 2018)

included public calls for any information on the location of the undersigned.  This nightmarish

stalking campaign resembled more of a human foxhunt than that of quality news programming.

Michaels has also been tentatively identified as the person visiting the mailbox of the

undersigned (California) and asking questions about the box-holder's physical address.

10.    _Defendant is a Public Figure while Undersigned is not_.  In *New York Times Co. v.*

*Sullivan,* the Supreme Court defined rules of defamatory publication that apply not only to public

officials but to any public figure (like the Def).  *Gertz v. Welch, Inc.* 418 U.S. 323, 342.  Def is

clearly a public figure who has inserted himself into major national political controversies with

his *right-wing* sidekicks like Jerome Corsi, Larry Klayman and Laura Loomer (all of whom are

monitored and watched by the Southern Poverty Law Center (S.P.L.C.) for hate speech).  Mr.

Klayman, esq. represents both Loomer and Corsi in outlandish lawsuits (*Loomer vs. Twitter.Com*

and *Corsi vs. Robert S. Mueller, III, Office of the Special Counsel*) which are extensively

promoted by the Def with a constant stream of anti-government chatter to *echo chamber* these

*lawsuits* with presumed *evidence*.

11.    The undersigned arguably is not such a public figure.  The undersigned had only used a

stage name ("Dave Acton") to create educational videos on a YouTube channel that catered to

disaster preparedness and medical first-aid as a licensed Emergency Medical Technician.  The

undersigned became a tangential unwitting participant in the acrimonious feud between Def and

his former room-mate and sidekick George Webb Sweigert (undersigned's brother).  Plaintiff

was dragged (some say drug) into this controversy and is only defending himself against the

Def who drew first blood.

12.     In context of only the Port dirty bomb incident (hoax) debate, the undersigned is at most

a limited public figure and more probably a private citizen that was involuntarily drug into this

ugly situation and is acting in self-defense against the Def. Even if this Court finds the

undersigned as a limited public figure, the Def's speech would have to be necessarily limited to

the scope of that public controversy (Port hoax incident). *Gertz v. Welch, Inc.* 418 U.S. 323,

345. The Def would be prohibited from the broadcast of extraneous attacks and unfounded

accusations of criminal conduct (implied defamation, trade libel and slander per se). A person

acts with <u>malice</u> if the publication was made with knowledge that the statement was false or with

reckless disregard for its truth. *Gertz v. Welch, Inc.,* 418 U.S. 323. This demonstrates injury

and Article III standing of the undersigned by meeting the "plausibility test" created by *Bell Atl.*

*Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

## GENERAL ALLEGATIONS

## ADDITIONAL PARTY

13.     Paragraphs 1 thru 12 are hereby cited as if fully restated and realleged.

14.     Intervenor Applicant MOVES that DAVID CHARLES HAWKINS [herein Hawkins] of

Cloverdale, British Columbia, Canada be added as a proper defendant that has inflicted

damaging civil torts in cooperation, coordination, agreement and in continuity with the Def. In

fact, both the Def and Hawkins have become inextricably intertwined via their social media

platforms that continuously promote one another's Internet podcasts and web sites.

15.     Hawkins has a long history of defrauding the public with claims that he is a "forensic

economist" and is "Cambridge educated". Using the title of "Cambridge educated forensic

economist", Hawkins claims to have scientific research processes and patentable novel

approaches to solve "cold cases" and other "unsolved crimes". He then uses these junk science

processes to accuse the undersigned of horrible crimes.

16.     Via his numerous podcasts, distributed in a widely pervasive manner daily, Hawkins

claims to have scientific data and "results" that offers conclusive proof that certain parties are

guilty of horrific crimes. One of Hawkins favorite targets is the unfortunate retired Senior

Executive Service (SES) federal employee named Kristine Marcy. The continuous savage

attacks on Marcy by Hawkins and the Def are stunning. The two have accused Marcy of:

- Creating the Department of Justice (DoJ) PRIDE LGBTQ organization so that
  lesbians could infiltrate key positions within the U.S. marshals Service.

- Creating the database of the National Center for Missing and Exploited Children
  (NCMEC) to locate desirable human sacrifices for government elites.

- Creating "CON AIR", aka Joint Prisoner and Alien Transport System (JPATS) for
  the purpose of deploying convicts in "CONAIR SWAT TEAMS" to kill high
  value targets (as in child snuff films).

- Arranging for U./S. Small Business Administration mentor-protégé firms to act in
  concert with SERCO, INC. to abduct and kidnap small children for compromise
  operations and eventual death in snuff films.

17.     In summary, Goodman/Hawkins believe (and widely broadcast thru their podcasts) that

Marcy is a lesbian that created the DoJ PRIDE organization to enable lesbians to infiltrate the

U.S. Marshals Service for the purposes of kidnapping desirable children to be sold into human

trafficking, or to star in "kiddie snuff films". Hawkins has been spewing nonsense of this ilk for

over a decade, he has now joined forces with Goodman to attack and destroy the undersigned.

18.     Hawkins has implicated several innocent institutions within the jurisdiction of this Court in his "kiddie snuff film" narrative.  Both Goodman/Hawkins have openly mocked the Intervenor Applicant for notifying SERCO, INC., 12930 Worldgate Drive, Suite 600, Herndon, Virginia 20170 that continuous broadcasts by Goodman/Hawkins have claimed that SERCO was the prime facilitator of this snuff film network.  SERCO is regularly targeted as an on-line punching bag for the Def's CSTT podcasts.

19.     SERCO has been accused by Goodman/Hawkins (via CSTT) of working with DoJ PRIDE operatives to access the database of the National Center for Missing and Exploited Children (NCMEC) to locate desirable children that could be kidnapped and snuffed.  SERCO has been accused of designing and operating a "murder-for-hire" network that is somehow interfaced to the U.S. federal government's "Federal Bridge", which is a digital certificate certification authority that facilitates electronic commerce in a secure manner.

20.     Kristine Marcy is also accused of working with DoJ PRIDE lesbians and members of NCMEC to create a "snuff catalogue" that would allow "high end elites" to watch child snuff films via high-speed networking and visual labs. Another on-line punching bag for Goodman/Hawkins is the high-speed networking research funded by the National Science Foundation (NSF), 2415 Eisenhower Blvd, Alexandria, VA 22314.  See NSF Instrumentation Award No. EIA-9871058, "Electronic Visualization Laboratory" (EVL), University of Illinois at Chicago (UIC).  According to the daily Goodman/Hawkins drum-beat, the UIC EVL is used to facilitate "dead-pool" betting on the exact time of death of a victim featured in a live high-bandwidth visual "pay-for-view type" of event.  See **Exhibit Five [Exh.5]**

21.     The foregoing describes how Goodman/Hawkins act with callous and reckless disregard of the facts against at least three institutions that find their headquarters in this jurisdiction.

22.     As **Exhibit Two [Exh.2]** clearly indicates, Hawkins is ramping up a smear campaign

against the Intervenor Applicant that will rival the Hawkins "Kristine Marcy" defamation and

harassment campaign. The Marcy smear campaign provides a clear indication as to the pattern

and practice of the inextricably intertwined duo of Hawkins and Goodman. In sum, the

undersigned has become the new "Kristine Marcy" for this pair. See **Exhibit Five [Exh.5]**

23.     This new and improved Info Ops smear campaign has specifically targeted the status of

the Intervenor Applicants as a Certified Ethical Hacker, which is an Information Technology

credential recognized by the U.S. Department of Defense pursuant to DoD Directive 8570. See

Appendix 3 to the DoD 8570.01-Manual, "Auditor", "Incident Responder", "Infrastructure

Support" and "Analyst".

24.     Hawkins distributes (under the watchful eye of Goodman) statements such as these:

     a.   "Serco Group's apparent frauds on the Five Eyes countries' patent offices, the

        Simulation and Hacking Information Technology (S.H.I.T.) **secretly embedded**

        **by Dave G. Sweigert** into existing EVL CAVE environments and Entrust federal

        bridge networks.  **[Exh.2]**

     b.   **My research indicates that Sweigert (email Spoliation-notice@mailbox.com!)**

        **left a backdoor** in Northwestern University's EVL IT Partnerships **[Exh.2]**

     c.   Teachers through patented high-speed bit-spread backdoors **apparently left by Dave**

        **Sweigert in the EVL IT networks which** allegedly allowed BBC [Exh.2]

     d.   truth test the alibis of the **Rogue Teachers on 9/11 and possible hacks by Dave G.**

        **Sweigert [Exh.2]**

     e.   Who, apparently used an ethical (?) hack of the EVL BAT CAVE by **David G.**

        **Sweigert,** former consultant to U.S. Army Simulation, Training and

        Instrumentation Command (STRICOM) in Orlando, Florida, for **"Con Air**

**Serco's Catalogue Killing\*"** of Bartels and his Cantor Fitzgerald colleagues on

9/11. [Exh.2]" [emphasis added]

25.      This smear campaign death march, which destroyed the personage of Kristine Marcy, is

now aimed to destroy the personage of the Intervenor Applicant.  It is the objective of this latest

reputation destruction campaign to inflict economic injury and ruin the professional reputation of

the undersigned as a highly skilled member of this nation's cyber defense forces.

26.      By relying on monikers such as "Cambridge educated forensic economist", Hawkins

deceives the public that he has attained a professional designation that is related to the

presentation of evidence within a framework of rules relied upon by the courts.  This fraudulent

presentation ("Cambridge educated forensic economist") fortifies the junk science research

presented by the duo to target individuals for reputation destruction with "evidence".

27.      Hawkins has clearly stated what – he himself – believes is the purpose of a "forensic

economist".  **"Forensic economics is about people who want to bring the ground truth of the

crime scene – or fraud scene – into court and argue from the fact based."**  See Jason

Goodman channel on YouTube with posted video "Can Simulation Hacking IT Guru Sweigert

Explain BAE's Bit Spread 9/11? With David Hawkins", 12:47 timer, released March 1, 2019 at

Internet URL: https://www.youtube.com/watch?v=7J2IhyrT4PQ&t=12s [Contained within

**Exhibit Three**].

28.      Both Hawkins and the Def are frauds that operate a "news service" for the sole purpose

of destroying people's lives – nothing more.

### INTERVENOR-APPLICANT

29.      The undersigned commenced unrelated litigation in this district in 1994 to obtain relevant

documents from the Central Intelligence Agency in 1:94-cv-01585, Date Filed: 12/02/1994.

30.    As the Court is aware, the undersigned filed several "DECLARATIONS" between May and June 2017 in this Court. (Dkt Nos: 51, 54, 55, 56, 58, 59 & 60 [incorporated as if fully restated herein]). It is instructive to note that the undersigned is Certified in Homeland Security, Level – III by a professional governance body (see [pg.24of25,dkt.no.58]).

31.    The undersigned is also a former member of the American Bar Association (ABA) Information Security Committee (ISC) and was a technical contributor to the "PKI Assessment Guidelines" (PAG). As the Court will learn, the undersigned is ridiculed, mocked, and singled out for retribution and targeting by Goodman/Hawkins for such activities as his participation in ABA ISC PAG (generally "federal bridge"). [See Publication: PAG v 1.0, May 10, 2003, ABA ISC]. Goodman/Hawkins have distributed several social media video productions accusing the undersigned of using his knowledge of Public Key Infrastructure (PKI) to arrange for the death of New York fire fighters, U.S. military personnel, and others innocents using his "hacking" skills to breach network security.

**32.**    The general narrative for these malicious attacks on the undersigned can be catalogued as in the variety of "the Federal Bridge" or "the Federal PKI Bridge", or "the Federal Certification Authority Bridge". The Federal Bridge is a root certificate authority (digital certifications aka International Telecommunications Union (ITU) standard 509.v3) that enables cross-domain electronic commerce between the federal and state governments and large federal contractors. The Federal Bridge is held up by Goodman/Hawkins as the "murder for hire" network that enables the kidnapping, torture and murder of children in snuff films.  See **Exhibit Four [Exh.4].**

33.    It is instructive to note this description of the U.S. Government's Federal Bridge:

       **Federal Public Key Infrastructure Management Authority (FPKIMA)**

Governed under the Federal PKI Policy Authority (FPKIPA) and managed by GSA, the Federal Public Key Infrastructure Management Authority (FPKIMA) provides trust infrastructure services to federal agencies.

**Federal Bridge CA (FBCA)** is the PKI Bridge that enables interoperability between and among federally operated and business partner PKIs.

(https://www.idmanagement.gov/topics/fpkima/)

34.    The undersigned can confidently assert that after listening to dozens of hours of video content that feature both the Def and Hawkins, that both operate from a position of complete ignorance, or in complete reckless disregard of the truth, regarding their joint podcast shows that describe the Federal Bridge as the "murder for hire" network used to transmit orders to execute children in pedophile snuff films.  The continuous distribution of this Goodman/Hawkins junk science *research* fuels the narrative that the Federal Bridge is the favorite tool of lesbian child abductors operating within the U.S. Marshals Service (USMS).  **[Exh.4].**  Another spin by Goodman/Hawkins is that the undersigned has performed illegal acts in the performance of his duties related to participation in ABA ISC PAG type of activities.

35.    In previous employment, the undersigned was an associate and consultant to the Center for Forensic Economic Studies (CFES), Eighth Floor, 1608 Walnut St., Philadelphia, PA 19103 in 2003 (https://cfes.com/).  This CFES engagement was directed at building up an electronic evidence and Electronic Stored Information (ESI) [see Fed. R. Civ. Proc. Rule 34] practice for CFES.

36.    In his role at CFES, the undersigned worked elbow-to-elbow with real bona fide forensic economists – a title which David Hawkins claims for himself.  Again, the undersigned can confidently state that Goodman/Hawkins operate from a position of complete ignorance, or

reckless disregard of the truth, in the arena of forensic economic theory -- which is a litigation

tool. The following text from the CFES web-site is instructive on this point:

> **THE CENTER FOR FORENSIC ECONOMIC STUDIES** is a leading provider of
>
> expert economic analysis and testimony. Our economists and statisticians consult on
>
> matters arising in litigation, with a focus on the analysis of economic loss and expert
>
> witness testimony on damages.
>
> We assist with discovery, uncover key data, critique opposing claims and produce clear,
>
> credible reports and expert testimony. Attorneys and their clients have relied on our
>
> expertise in thousands of cases in jurisdictions across the country.
>
> Contact the Center for Forensic Economic Studies to discuss how we can assist you in the
>
> preparation and presentation of your damages case.
>
> (https://cfes.com/)

37.     Hawkins is simply a fraud who has pinned the title of "Cambridge educated forensic

economist" to his junk science research for the purposes of deceiving members of the public with

his deceptive video podcast content. The misconduct of Hawkins is ratified, affirmed and

approved of by the Def. The purpose of this fraudulent and deceptive tactic (forensic economist

label) is to fortify the sham hoax junk science-based allegations pushed by Hawkins/Goodman.

38.     Although Goodman/Hawkins understand that their fraudulent podcasts are false and

misleading, the two continually push these deceptive narratives to terrorize audience members

that the U.S. Government can easily kidnap their children using the Federal Bridge (and we all

have the undersigned to blame). The purpose of this Goodman/Hawkins scheme is to collect

contributions, donations and patrons on the PATREON.COM wire transfer network (see

[dkt.no.55]).

## SPECIFIC ALLEGATIONS

### COUNT ONE: VIOLATION OF 42 U.S.C. 1985 FOR RETALIATION

39.     Paragraphs 1 thru 38 are hereby cited as if fully restated and realleged.

40.     Def Goodman and Hawkins entered a civil conspiracy for the purposes of generally

destroying the personage of the undersigned.  This was accomplished via the use of junk science

and "buzz words", in conjunction with the statements of a "Cambridge educated forensic

economist", to create "research results" that would implicate the undersigned in a variety of

crimes related to the undersigned's professional certification as a Certified Ethical Hacker

(CEH).  See **Exhibit Three.**  Caveat: DoD Directive 8570, Appendix 3.

41.     This Court is in the strongest position to evaluate the actions of the Def regarding

violations of the anti-conspiracy sections of 42 U.S.C. § 1985(2) (Obstructing justice;

intimidating party, witness, or juror) and § 1985(3) (Depriving persons of rights or privileges)

concerning retaliatory conduct directed at a witness of this instant lawsuit.

42.     It is alleged that after the undersigned filed documents and declarations in this Court (Dkt

Nos: 51, 54, 55, 56, 58, 59 & 60 [incorporated as if fully restated herein]), which caused the Def

to use his CSTT social media empire to intimidate, humiliate, threaten and cause the undersigned

to live in fear.  Def retaliated against the undersigned with public calls to violence, broadcast of

trade libel, widely distributed slander, defamation and various invasions of privacy.  See Def's

phone calls to another CSTT enemy "Titus Frost" **[pg.3of10,dkt.80]**, "Jason then hung up and

called my boss, and threatened my boss with information that the FBI would be investigating

me," [para.9].  Caveat this is known as "crowdstalking".

43.     The Def's attacks on a witness to this instant lawsuit is an attack on the very integrity of

this Court.  Several circuits have found that the main purpose of 42 U.S.C. § 1985(2) is to protect

the integrity of the court itself. *Rutledge v. Arizona Bd. Of Regents*, 660 F.2d 1345, 1354-55 (9th

Cir. 1981); *McCord v. Nailey*, 636 F.2 606, 617 (D.C. Cir. 1980) *cert. denied*. The *Rutledge*

court reasoned that there was a congressional desire to protect the integrity of the federal

judiciary. 636 F.2d at 615.

44.     The malevolent conduct is clearly depicted in the attached **Exhibit One** which is a simple

search of "JASON GOODMAN SWEIGERT" on the YouTube.Com platform. The search

results show more than a dozen (+12) video productions, distributed in a widely pervasive

manner, to an audience of thousands worldwide. The content of these podcasts is designed to

injure, damage, and create loss to the liberty interests in a professional technical reputation by

the undersigned.

45.     For the past 12 months, Def has widely disseminated the fraudulent narrative that there is

a "Campaign" directed at the Def (see generally dkt. no. 78). The idea of this "Campaign" has

been denied by many of the individual accused by Def in dkt. No. 78.

46.     Third parties have catalogued the continuous defamation, harassment and smear

campaign of the Def in statements filed with the Court [**dkt.nos.79,80,82**]. Consider the public

attestation by the Def that he has "**evidence** of felony crimes by the Plaintiff, Intervenor

Applicant and third-party co-conspirators.". [**pg.2of8,dkt.79**]. These "felony crimes" allegedly

involved the signers of these declarations – which have completely rejected and denied the

assertion of the Def. [**dkt.nos.79,80,82**]

47.     As described in dkt. no. 80, YouTube personality "Titus Frost" describes how the Def

telephoned his place of employment on numerous occasions to threaten that an active F.B.I.

investigation was in progress and that "Titus Frost" would be implicated in a crime. This is a

very representative act of the Def, to intimidate and threaten individuals with purported F.B.I.

investigations. The Def also publicly announced that he personally called every ambulance service in the Mount Shasta, California region to disrupt the employment of the undersigned (a licensed Emergency Medical Technician) with similar threats (F.B.I. investigations). Caveat: this is known as "crowdstalking".

48.     As described in dkt. no. 51-1, Def is fond of using the phrase **"distributed decentralized defamation attack"**, which he reported to the F.B.I. (purportedly). Def sates in his podcast **(pg.3of12,dkt.51-1)** [May 6, 2018 podcast]. "I called Dean Fougere [Titus Frost] ... to alert him that I was in the process of gathering information **to bring to the FBI to tell the FBI** that I believe a new type of crime is taking place. **A distributed decentralized defamation attack.**". [pg.3of12,dkt.no.51-1]. Interestingly, the Def maintains very public associations with a host of attorneys, to include Larry Klayman (see Southern Poverty Law Center "watch list").

49.     On May 4, 2018, Def accused the undersigned of planning the Port of Charleston (South Carolina) dirty bomb hoax of June 14, 2017. "I believe they are working together. And I believe that they planned that incident in the Port of Charleston – for a number of reasons.". [pg.6of12,dkt.51-1].

50.     On May 4, 2018, Def stated "I am extrapolating that his [undersigned] interactions with the CIA and the Sandinistas could indicate involvement in a criminal operation of Iran-Contra." [pg.6of12,dkt.51-1]. Def is referring to the 48 hours of captivity the undersigned endured in Nicaragua when a peace keeping helicopter (in which he was a passenger) was forced to execute an emergency landing in Managua in 1981. (Described [pg.1of5,dkt.51]).

51.     On May 4, 2018, Def stated "We are going to start to assemble the evidence we have. Evidence that is going to link Dave [undersigned], and George [Webb Sweigert], and Robert

David Steele, and Manual Chavez [YouTube name "DEFANGO"] ...". Essentially, the same list as "co-conspirators" described in Def's dkt. no. 78. [pg.6of12,dkt.51-1].

52.      On May 4, 2018, Def stated "I really do hope that Dave [undersigned] brings this to some federal body that has jurisdiction over criminal prosecution in this matter. Because I will see to it that man be put into jail.". [pg.7of12,dkt.51-1].

53.      On May 4, 2018, Def stated "if he wasn't the worm that he is – the waist of oxygen – the disgusting human being – whose own father knew that the proper place for him [undersigned] was to sleep on newspaper with dog shit." [pg.7o12,dkt.51-1]. These excerpts are from a video podcast featuring Joe Napoli of San Diego, California. See "The Trolls of Mount Shasta". (https://www.youtube.com/watch?v=qyg9YejHy0k).

54.      The foregoing excerpts speak to the motive of malice.

55.      It was in this environment of constant public attack that caused the undersigned to file the declarations with this Court (Dkt Nos: 51, 54, 55, 56, 58, 59 & 60). Unfortunately, the filing of these declarations only enraged the Def more, which led to a measurable increase in the intensity of the smear campaign. Following the filing of the undersigned's declarations the Def published more videos with junk science provided by Michaels to implicate the undersigned in more crimes.

## COUNT TWO: VIOLATION OF 42 U.S.C. 1985 FOR CONSPIRACY

56.      Paragraphs 1 thru 55 are hereby cited as if fully restated and realleged.

57.      It is hereby alleged that Def Goodman and Hawkins are inextricably intertwined into a civil conspiracy to exact retaliation and retribution against the undersigned for his appearances as a witness in this instant lawsuit. An artifice of the civil conspiracy is the dissemination of fraudulent and deceptive claims concerning the undersigned, accompanied with allegations of

18

criminal activity. The dissemination of such podcast content is malicious in nature and designed to directly injure, harm and damage the undersigned's technical career in the arena of ethical hacking (a legitimate DoD recognized occupation; DoD Directive 8570, Appendix 3.).

58.     The objectives of the civil conspiracy are to damage, injure, and ruin the technical career of the undersigned. Carefully crafted wording is injected into podcasts to include: illegal, hacking, man-in-the-middle attack, back-door, knowledge of networks, etc. to insinuate that the undersigned was involved in illegal hacking activity, incompetence, misconduct, etc. Such acts of trade libel and defamation by insinuation orbit around the undersigned's professional career and livelihood.

59.     Goodman and Hawkins knowingly agreed to use podcast smear campaigns, trade libel, defamation, threats, reputation destruction and corrupt persuasion to engage in the distribution of false and misleading podcast content directed toward the undersigned with the intent to influence, hinder, delay or prevent the testimony of the undersigned in this official proceeding.

### COUNT THREE: CIVIL CONTEMPT

60.     Paragraphs 1 thru 59 are hereby cited as if fully restated and realleged.

61.     Def simply does not respect this, or any other, federal court. Def has released more than 57 video podcasts that include some reference to a "fake lawsuit" brought by Robert David Steele. Def also invites litigation while playing a stalking victim. As noted in [pg.1of22,dkt.no.59] SIXTH DECLARTION of the undersigned, "GOODMAN: Why don't you release whatever evidence it is you think you have. **And you can intervene in the lawsuit.** We all know it is a fake lawsuit.".

62.     Such cavalier remarks are an insult to the integrity of the U.S. federal court system. Not only has Goodman (and his sidekick Hawkins) continually attacked a federal witness to this

federal proceeding, the Def openly mocks the court and its decisions. Such behavior smacks of civil contempt of this Court. This creates a shadow of doubt as to Def's true motives, which appear to be rooted in bad faith and failure to comply with normative rules, laws and customs associated with the litigation process. A definition of civil contempt is provided in the DoJ Criminal Resource manual; quoted in relevant part:

## 752. GENERAL DEFINITION OF CONTEMPT

Contempt of court is an act of disobedience or disrespect towards the judicial branch of the government, or an interference with its orderly process. It is an offense against a court of justice or a person to whom the judicial functions of the sovereignty have been delegated.

The power of a federal court to punish a contempt of its authority is limited by Title 18, United States Code, Section 401 to:

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

[JM 9-39.000]

By contrast, civil contempt sanctions--which are designed to compel future compliance with a court order--are coercive and avoidable through obedience, and "thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *International Union, UMWA v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 2557 (1994).

[JM 9-39.000]

63.     In *Griffin v. County School Board*, 363 F.2d 206 (4th Cir. 1966), the court cited "In effect it was a "resistance to its (this court's) lawful writ, process, order, rule, decree or command." It is the active resistance and open defiance to the litigation process which casts the shadow of civil contempt over the CSTT operation.

64.     Many federal courts do not require a violation of a specific mandate to engage the court's inherent powers to mitigate civil contempt.  In sum, many federal courts have resorted to a basic line of reasoning: (1) broad construction of the terms on the contempt statute, (2) interpretation of a legal action as an implied order, (3) inapplicability of the statute as a limitation on the power of the courts.

65.     In the case of witness intimidation, retribution and retaliation (as practiced by the Def) it is instructive to consider the case of *United States v. Zavelo*, 177 Fed. 536 (C.C.N.D. Ala. 1910). The court held that witnesses were immune from the service of process while attending trial. The purpose of this immunity, or privilege, is to insure the attendance of witnesses.  [*Civil Contempt in Federal Courts*, 24 Wash. & Lee L. Rev. 119 (1967), (https://scholarlycommons.law.wlu.edu/wlulr/vol24/iss1/12)].

66.     In this context the Court should consider that 18 U.S.C. Section 1512(b)(1) makes it a crime to (1) knowingly (2) use intimidation, threats or corrupt persuasion or engage in misleading conduct toward another (3) with the intent to influence, delay or prevent the (4) testimony of that person in an official proceeding.

67.     The actions of the Def to continuously attack, defame, intimidate and threaten participants in this instant lawsuit is reprehensible and is undertaken in open defiance to the integrity of this Court.  This Court has inherent powers to force acceptable conduct by the Def.

21

## LEGAL ARGUMENT

68.    As a preliminary matter, it has long been settled that the federal courts retain their inherited judicial power to compel the behavior of parties to litigation and to compel orders to cease the type of misconduct described above (Fed. R. Civ. Proc. Rule 16).  The federal Courts can exercise their inherent power in an independent manner to support judicial efficiency and the expeditious flow of litigation.  *Link v. Wabash R.R. Co.,* 370 U.S. 626 (1962).

69.    ***Def's intimidation of Undersigned for his status as a witness to this lawsuit.***  Between May – June 2017 Plaintiff seven (7) declarations in this instant lawsuit.  In open defiance of 42 U.S.C. §§ 1985(2) clause one the Def calculated to economically injure, intimidate, coerce and humiliate the undersigned to dampen, obstruct and/or retaliate against the undersigned for the submission of documents to this Court.  The bright line threshold of § 1985(2) (clause one) was crossed by the Def's continuing and on-going malevolent acts which allows for a private remedy under Section 1985(3)(clause iii).

70.    These malevolent acts (to include smear campaigns) invade the undersigned's <u>liberty interest in a good reputation</u> and future employment, and thus created an actionable federal offense.  "Such property interests are "created and their dimensions are defined by existing rules or understandings that stem from an <u>independent source such as state law</u>." [emphasis added]  Footnote 75, *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049 (2d Cir.)

71.    In *Farese v. Scherer* [342 F.3d 1223, 1229 (11th Cir. 2003)], the court noted that § 1985(2) prohibits conspiracies to intimidate parties or witnesses to federal lawsuits.  The statute proscribes "conspiracies that interfere with * * * the administration of justice in federal courts".

72.    A *per se* violation of § 1985(2) (clause one/i) ("Obstructing Justice; Intimidating Party, Witness, or Juror") exists when two or more persons (the Def and his numerous sidekicks)

conspire to deter, by force, intimidation, or threat any party or witness in any court of the United States from attending to the matters of the court. David Charles Hawkins, Cloverdale, British Colombia, is one of the latest co-conspirators to work with the Def to tarnish irreparable the undersigned's reputation in his trade (trade libel). See **Exhibit Two** attached.

73.     As more clearly depicted in Exhibit Two, the undersigned has been linked as responsible for (1) the deaths of 343 New York fire fighters at the World Trade Center on 9/11/2001, (2) orchestrating the hacking break-in of "continuity of government" war games on 9/11/2001 to facilitate the death of 3,000 people, etc. **[Exhibit Two]**.

74.     Def's co-conspirator (David Charles Hawkins) uses the pattern and practice of pseudo junk science "research" to subject "targets" to public disgrace, ill fame and public opprobrium. Hawkins has a long history of attacking (in a relentless manner) an innocent known as Kristine Marcy. See **Exhibit Five [Exh.5].**

75.     Section 1985(3)(clause iii) provides a remedy for damages to anyone "injured in his person or property" or deprived of a federal right or privilege as a result of a conspiracy proscribed by Section 1985(2) (clause i).

76.     In *Haddle v. Garrison*, 525 U.S. 121, the Supreme Court held that tort injuries (similar to the undersigned's described in the foregoing) are cognizable under § 1985(3)(clause iii). See to "injure [petitioner] in his person or property". Further, "[t]he statute provides that if one or more persons engaged in such a conspiracy 'do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property', . . . the party so injured ... may have an action for the recovery of damages occasioned by such injury ... against any one or more of the conspirators. § 1985(3)." See footnote no. 2: "Section 1985(3) contains the remedial provision granting a cause of action for damages to those harmed by any of the

conspiracies prohibited in §1985. See *Kush* v. *Rutledge* , 460 U. S. at 724-725 (listing the various conspiracies that §1985 prohibits).

77.  It is instructive to note the U.S. Department of Justice Amicus Brief (1998), submitted to the *Haddle v. Garrison* court, which summarizes the property issues under consideration by the Court, "[t]he statute provides a remedy in <u>damages to anyone who is injured in his person or property</u> or deprived of a federal right or privilege as a result of an act in <u>furtherance of a conspiracy prohibited under any part of Section 1985</u>, including clause one of Section 1985(2) emphasis added] [Internet URL: <u>https://www.justice.gov/osg/brief/haddle-v-garrison-amicus-merits</u> ]. To summarize, § 1985(3) class-based animus limitations cannot be used to narrow the scope of a § 1985(2) (clause one) claim.

78.  "*Held:* No allegations of racial or class-based invidiously discriminatory animus are required to establish a cause of action under the first part of § 1985(2). The statutory provisions now codified at § 1985 were originally enacted as § 2 of the Civil Rights Act of 1871, and the substantive meaning of the 1871 Act has not been changed.

79.  "The provisions relating to institutions and processes of the Federal Government (including the <u>first part</u> (clause one) of § 1985(2)) … contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws. Thus, the reasoning of *Griffin* is not applicable here, and, given the structure of § 2 of the 1871 Act, it is clear." *Kush v. Rutledge*, 460 U.S. 719 (1983).

80.  ***The Def is not prejudiced by this action.*** The Def would not be prejudiced by allowing the undersigned to intervene in this action. There has been no (1) undue delay in filing the motion to intervene, (2) the adverse party has been noticed, (3) the undersigned is acting in good faith without a dilatory motive, (4) it is not a failure to cure deficiencies of previous pleadings,

24

(5) there is no undue prejudice to the Def, and (6) the proposed intervention is not futile.

*Forman v. Davis*, 371 U.S. 178, 182 (1962).

## REQUEST FOR RELIEF

81.     As the foregoing indicates, the time is ripe for this Court to curtail Def's out-of-control retaliation and vindictive attacks on the undersigned.

82.     The Court should rely on its inherent power to ORDER the removal of all content referencing the undersigned from all social media control by Hawkins/Goodman.  This includes references made on PATREON.COM, YouTube.COM, Facebook.Com, Twitter.Com, Periscope.Com, BitChute.Com, etc.  The media empire of Hawkins and Goodman is extensive.

83.     The Court should rely on its inherent powers and conduct a SHOW CAUSE hearing as to why the Def should not be fined and held in civil contempt for his on-going attacks ("fake lawsuit") on the integrity of this Court.  Such a Court finding should provide a history of the Def's reprehensible conduct as a reference tool for others that have been attacked by the Def.

84.     The Court should allow the undersigned to be permitted to act as a PLAINTIFF in this litigation, which will aid the administration of justice by providing the Court with a documented history of the Def's activities of industrial scale defamation, slander, trade libel and defamation by insinuation.

85.     The court should rely on its inherent powers to hold Def accountable for obstruction of justice and witness tampering.  Def's conduct is nearly text-book obstruction of federal proceedings – judicial, congressional and executive.  The Def has used deception and corruption and intimidation to prevent the production of evidence and witness harassment to prevent the production of evidence.  The Def uses the CSTT social media empire to obstruct justice and intimidate witnesses.

25

86.    The court should rely on its inherent powers to find that Hawkins is an accomplice working with the Def to participate in the foregoing articulated misconduct; to include obstruction of justice and intimidation of witnesses.

## CONCLUSION

87.    Plaintiff's pleading burden has not only met, but, has exceeded the pleadings threshold, particularly as no discovery has occurred, and he has established standing.  Thereby, it would be premature to dismiss any causes of this motion.

I hereby certify that the foregoing information and attached exhibits are truthful and correct under penalties of perjury.

Signed:  3/27/19                                    Respectfully submitted,

D. George S. Weigert, *pro se*